**Kenneth Wayne JACKSON, Appellant**

v.

**The STATE of Texas.**

**No. PD–1655–03.**

Court of Criminal Appeals of Texas.

April 13, 2005.

Lydia M.V. Brandt, Richardson, for appellant.

Kim Schaefer, Asst. DA, Dallas, Matthew Paul, State's Attorney, Austin, for state.

MEYERS, J., delivered the opinion of the Court, in which KELLER, P.J., and PRICE, JOHNSON, HOLCOMB, and COCHRAN, JJ, joined.

Appellant was convicted of murder and sentenced to sixty years' imprisonment. Texas Penal Code Sec. 19.02(b)(1). Appel-

lant appealed the trial court's limitation of his use of mental-illness testimony. The court of appeals affirmed the conviction. *Jackson v. State*, 115 S.W.3d 326 (Tex. App.-Dallas 2003). We granted review to determine whether the doctrine of diminished capacity exists in the jurisprudence of Texas. We will affirm.

## FACTS

Appellant and his older brother, Eric, arrived home between 4:00 and 5:00 in the morning after an evening out with friends. Their sister, Tina, heard her brothers come in and went into the living room to talk to them. She testified that Appellant wanted to wake up his mother, but Eric would not allow him to go into her bedroom. Eric blocked the door to the bedroom and restrained Appellant from entering. The brothers began to fight, pushing each other, hitting each other and pulling each other's hair. The fighting awakened their mother, and she came into the living room and told Appellant and his brother to go to bed. Tina testified that they continued to argue, and Eric asked her to call the police because Appellant was becoming violent and would not stop fighting. She also stated that Appellant threatened his brother and told him that he was going to get him if he went to sleep. Tina did not call the police, but the fighting eventually calmed down. Appellant went to sleep on the couch in the living room, and Eric went to sleep in their mother's bedroom. Several hours later, Tina drove their mother to work. While his mother and sister were out of the house, Appellant went into the kitchen, got a hammer, entered his mother's bedroom where Eric was sleeping, and hit him in the head with the hammer.[1] Appellant returned the ham-

---

**1.** Appellant claimed he hit his brother only once but the medical examiner who performed the autopsy testified that the injuries

mer to the cabinet in the kitchen and then called 911. The first police officer to arrive testified that Appellant told them he didn't know what happened, but he thought his brother had been shot.

At trial, Appellant presented testimony regarding his mental illness. His mother and sister testified that Appellant had "spells" and exhibited strange behaviors including talking to himself, hiding food in his bedroom, and hanging clothes on the walls and windows rather than in the closet. His mother testified that doctors had told her that Appellant was capable of killing, and had instructed her to call the police whenever Appellant acted violently toward his brother. When the family called the police, Appellant was usually released the next day, but on one occasion he was admitted to Timberlawn mental hospital after he pulled a knife on his brother. Tina testified that Appellant had been diagnosed as being a paranoid schizophrenic. She stated, "I don't think Kenneth thinks about the things that he is doing before he does them. I don't think he thinks about it. I don't think he even knows what the circumstances would be. Sometimes Kenneth is—he's fine, and the next minute, it's like he's another person." She also stated, "I don't think that Kenneth meant to kill him. I think he just wanted to hurt him, because, you know, he was—they had been fighting."

The defense called forensic psychiatrist Dr. James Grigson to testify. The State requested a hearing under Rule of Evidence 705(b), to examine the facts upon which the doctor based his opinions. The trial court denied the State's request, but limited the mental-illness testimony, stating that it would not allow an insanity defense to be raised at that late date without notice to the State. The following is the testimony of the defense psychiatrist regarding Appellant's history of mental illness.

[Defense] Would you please explain to the ladies and gentlemen of the Jury your findings from the—tell us a little bit about his history, some of the findings that—where he's been located, et cetera?

[Dr. Grigson] He's been seen at Parkland emergency room, and also in 1998, he was hospitalized at Timberlawn Psychiatric Hospital here in Dallas for about a week. In his history it stated that he became mentally ill somewhere around about age 14. He has been diagnosed as schizophrenic and as bipolar disorder, both psychotic episodes.

[Defense] Explain to the ladies and gentlemen of the jury what you mean by schizophrenic?

[Dr. Grigson] Schizophrenia is one of our more severe mental illnesses. The individual has gross impairment in terms of interpersonal relationships, the way they get along with other people, and gross impairment in terms of reality testing. They misperceive what's going on around them.

[Defense] What about paranoia?

[Dr. Grigson] Paranoid is a descriptive term of a type of schizophrenia where the individual that is suffering from paranoid schizophrenia usually believes that people are plotting against them or trying to do something to them, trying to harm them in some way.

[Defense] What about bipolar?

[Dr. Grigson] Bipolar is another severe mental illness. The individuals may only have manic states, or they may only have depressive states, or they

to the skull indicated that the victim had been struck twice.

may have alternating manic and depressive states.

[Defense] What about mental retardation, sir?

[Dr. Grigson] Mental retardation is where the individual has an IQ below 70.

[Defense] Okay. Was there any—in his history or your examination, was there any mental retardation that you can recall?

[Dr. Grigson] No, sir, there's not any.

[Defense] Pass the witness, your honor.

[CROSS EXAMINATION]

[State] Dr. Grigson, you've had an opportunity to review his various medical files?

[Dr. Grigson] I did.

[State] And did you notice that he in some—in his files and on occasions, he had—the Defendant, Mr. Jackson, had a tendency to become violent?

[Dr. Grigson] He has.

[State] With his brother or with his dad or other family members?

[Dr. Grigson] That's correct.

[State] And, in fact, that's the way—is that a way that some people with schizophrenia or have these psychotic episodes, that's how it manifests itself where they actually become violent?

[Dr. Grigson] It can happen in individuals with schizophrenia or bipolar, or it can happen in an individual that has neither.

[State] And they can become really violent. I mean, on some occasions he was known to have pulled a knife on his brother, or hit his brother, or hit his dad with a bat?

[Dr. Grigson] That's correct.

[State] And you—you say that you analyzed him on May 15, what would be ten days after the offense date?

[Dr. Grigson] Yes, sir, I did.

[State] And it's your opinion that he was competent?

[Dr. Grigson] Right. He had sufficient present mental ability to consult with his attorney with a reasonable degree of rational understanding, and he had a rational, as well as a factual understanding regarding the proceedings against him. Therefore, it was my opinion that he was competent at that time to stand trial.

[State] And he was still competent in June when you interviewed him?

[Dr. Grigson] Yes, sir, he was.

[State] And that's the last time that you talked to him or interviewed him?

[Dr. Grigson] Yes, sir, it is.

[State] And I mean, you're not here telling the Jury that he's insane or didn't know what he was doing?

[Dr. Grigson] No. He was sane at the time. He was aware of what he was doing.

[State] And he knew the difference between right and wrong?

[Dr. Grigson] Yes, sir, he did.

[State] Okay. So he was—he was sane, and he was competent in your opinion?

[Dr. Grigson] Yes, he was.

[State] Okay. That's all I have.

In closing argument, the defense attempted to argue that the jury should find that Appellant lacked the mental capacity to intentionally or knowingly cause bodily injury. The State objected to the improper argument, and the objection was sustained. The jury found Appellant guilty, and he was sentenced to sixty years' imprisonment.

## COURT OF APPEALS

Appellant appealed, arguing in part that his due process rights were violated because the jury was not allowed to consider evidence of diminished capacity to negate the element of *mens rea.* Appellant relies on an exception to the rule set out in *Cowles v. State,* 510 S.W.2d 608 (Tex.Crim. App.1974), that evidence of mental illness short of the inability to distinguish right from wrong is not admissible at the guilt stage of the trial.[2] Although *Cowles* involved a non-specific-intent crime, the exception stated that such evidence may be admissible when specific intent is an element of the offense. The court of appeals cited *Wagner v. State,* 687 S.W.2d 303 (Tex.Crim.App.1985), in which we referred to the exception from *Cowles* as "dicta" and stated that lack of impulse control does not diminish criminal responsibility. *Id.* at 311. The court of appeals concluded that, because there is no diminished-capacity defense in Texas, the trial court did not err in failing to allow the jury to consider appellant's mental-illness evidence for the purpose of negating *mens rea. Jackson v. State,* 115 S.W.3d at 328.

Appellant filed a petition for discretionary review stating that the holding of the court of appeals conflicts with our holdings in *Penry v. State,* 903 S.W.2d 715 (Tex.Crim.App.1995), *Cowles,* and *Wagner.* Appellant reasons that past opinions have confused the doctrine of "diminished capacity" with the affirmative defense of "diminished responsibility," and that diminished capacity is recognized in Texas. Finally, Appellant argues that the U.S.

and Texas Constitutions require that a defendant be allowed to introduce evidence of diminished capacity. We granted review to determine whether the doctrine of diminished capacity exists in the jurisprudence of Texas.

## ANALYSIS

■ This case does not really present us with a reason to determine whether the doctrine of diminished capacity exists in Texas because the evidence of mental illness in this case does not negate *mens rea.* Rather, the evidence presented an excuse for the crime, i.e., that Appellant killed his brother because he was so paranoid that he thought his brother was out to get him. In fact, this evidence makes it even more apparent that Appellant intended to cause serious bodily injury or death to his brother. The evidence of appellant's paranoia simply provides a motive for the intentional act. The evidence presented was the type of excuse-based evidence that would be raised as an affirmative defense. As even Appellant acknowledges, Texas law does not recognize a lesser form of the insanity affirmative defense. However, we will address Appellant's claims.

First, we disagree with Appellant's contention that the opinion of the court of appeals conflicts with our opinion in *Wagner.* As in the case before us, Wagner did not raise an insanity defense. He did, however, want to admit evidence of a physical injury which may have caused impaired mental function and lack of impulse control. We stated that the evidence may have been admissible if it showed that

---

2. Note that at the time of the *Cowles* decision, Texas used the M'Naghten Rule to determine the defense of insanity. The M'Naghten Rule asked whether the accused could distinguish right from wrong at the time of the offense. Texas Penal Code Section 8.01(a) now states that "It is an affirmative defense to prosecution that, at the time of the conduct charged,

the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." This is also different from the insanity statute at the time of the *Wagner* decision, which included "or was incapable of conforming his conduct to the requirements of the law he allegedly violated."

Wagner acted with sudden passion arising from an adequate cause. *Wagner*, 687 S.W.2d at 311. However, because it did not, we held that admitting evidence of impaired mental function at the guilt phase of the trial would have confused the jury and therefore, it was not admissible. *Id.* at 312. We note that this has changed because sudden passion is now a punishment issue. As a result, even the part of *Wagner* which states that the doctrine of diminished capacity might require the admission of evidence of sudden passion arising from an adequate cause now would apply only to the punishment phase of trial and does not require evidence of mental illness falling short of insanity to be admitted at the guilt phase. Under Penal Code section 19.02(d), sudden passion and adequate cause are raised at the punishment stage of a trial to reduce the offense to a second-degree felony.[3]

We additionally disagree with the Appellant that the holding of the court of appeals conflicts with our holding in *Penry*. As in the case before us, Penry presented evidence of his mental impairments at trial and emphasized this evidence in closing arguments. Penry argued that the charge to the jury should have included an instruction to consider abnormal physical or mental conditions when deciding the issue of intent. *Penry*, 903 S.W.2d at 753. We stated that there was no reason to conclude that the jury failed to consider Penry's proffered evidence and held that "[a] specific instruction calling attention to the evidence on appellant's impaired mental abilities was unnecessary, and might have inappropriately vested this evidence with a disproportionate legal significance in the eyes of the jury." *Id.* at 754. Judge

Maloney wrote a concurring opinion agreeing that the instruction requested by Penry would have been an improper comment on the weight of the evidence and was properly denied. He then explained the difference between the diminished-capacity affirmative defense and the presentation of evidence of diminished capacity to negate *mens rea*. *Id.* at 767–68. Stating that past cases have confused the issues, Judge Maloney emphasized that most state and federal courts allow defendants to present evidence of diminished capacity to negate *mens rea*. *Id.* at 768–69.

As for Appellant's argument that the 8th and 14th Amendment of the U.S. Constitution and the right to due course of law under the Texas Constitution require that a defendant be allowed to introduce evidence of diminished capacity, we again fail to see how this applies to the facts of this case. While barring, excluding, or prohibiting all evidence relating to a mental condition may violate a defendant's rights in certain cases, in the case before us, no such violation occurred.

## DIMINISHED CAPACITY

■ The court of appeals correctly stated that Texas does not recognize diminished capacity as an affirmative defense i.e., a lesser form of the defense of insanity. In contrast, the diminished-capacity doctrine at issue in this case is simply a failure-of-proof defense in which the defendant claims that the State failed to prove that the defendant had the required state of mind at the time of the offense. To counter the State's evidence of the defendant's state of mind, the defense wishes to present evidence that the defendant has mental or physical impairments or abnormalities

---

3. In *Bradley v. State*, 688 S.W.2d 847, 853 n. 13 (Tex.Crim.App.1985), we invited the legislature to make sudden passion either an affirmative defense or a punishment issue. By a

1994 Legislative amendment to Penal Code Sec. 19.02, they chose to make it a punishment issue.

and that some of his abilities are lessened in comparison to someone without such problems.

As with the other elements of the offense, relevant evidence may be presented which the jury may consider to negate the *mens rea* element. And, this evidence may sometimes include evidence of a defendant's history of mental illness. Texas Code of Criminal Procedure Art. 38.36(a) states that:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

However, this evidence must still meet the admissibility requirements of Rule of Evidence 403. In *Smith v. State*, 5 S.W.3d 673 (Tex.Crim.App.1999), we stated that evidence admissible under Article 38.36(a) may be excluded under Rule 403 if the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex.R. Evid. 403. Even if evidence is relevant to an element of the offense, the trial court still must determine whether the evidence is admissible. Therefore, the trial judge has discretion to determine whether evidence of mental illness may be presented to negate the element of *mens rea*, or whether the evidence should be excluded on special grounds. If such evidence is admitted, the trial judge additionally has the discretion to determine whether the evidence supports a lesser-included-offense instruction.[4] In cases where such evidence was not admitted, it may be presented in the punishment phase in order to reduce the sentence assessed by the jury.

Appellant has not indicated what evidence, if any, he was prevented from introducing. He was able to present extensive evidence regarding his mental illness, his relationship with the victim, and his frame of mind on the night of the offense. There is no indication in the record that he was prevented from presenting any evidence at all. Therefore, we disagree with Appellant's assertion that he was prevented from introducing evidence relevant to whether he possessed the requisite *mens rea*. The State presented evidence that Appellant intentionally and knowingly caused the death of his brother. Appellant attempted to negate this evidence by introducing evidence of his history of mental illness through the testimony of his mother and sister, as well as the defense expert witness, Dr. Grigson. Appellant himself testified about his frame of mind on the night of the offense. The jury was able to hear all of this evidence, determine the weight of the evidence, and choose whether or not Appellant possessed the requisite *mens rea* to commit this offense. The jury believed that he did. The only thing Appellant was prevented from doing is arguing that the jury should find that he did not have the capacity to make the decision to intentionally and knowingly cause bodily injury and thus should find him not guilty. However, presenting evidence of mental illness does not then allow the defense to argue that the defendant is

4. In the case before us, the court of appeals correctly held that, "There was no evidence here that if appellant was guilty, he was guilty only of a lesser mens rea. Thus, we conclude the trial court did not err in refusing to instruct on involuntary manslaughter and criminally negligent homicide." *Jackson*, 115 S.W.3d at 330–31.

absolutely incapable i.e., does not have the capacity to intentionally or knowingly perform an act. There is simply no defense recognized by Texas law stating that, due to the defendant's mental illness, he did not have the requisite *mens rea* at the time of the offense because he does not have the capacity, or is absolutely incapable of ever forming that frame of mind. There is no indication of an abuse of discretion in this case.

In conclusion, the judge may determine whether mental-illness evidence may be presented, and if it is presented, may determine whether it raises the issue of a lesser-included offense. Then, the jury may decide if the evidence lessens the defendant's culpability by finding him guilty of a lesser-included offense if presented at the guilt phase of trial or by assessing a lesser sentence at the punishment phase.

In this case, the judge admitted evidence of mental illness and decided that it did not raise the issue of a lesser-included offense. The jury considered the evidence and believed that the State proved each element of the offense beyond a reasonable doubt, including the *mens rea* of intentionally and knowingly. The judgment of the court of appeals is affirmed.

KEASLER, and HERVEY, JJ., concurred.

WOMACK, J., did not participate.