

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-066-CR

JAMES ALLEN GROVE                                          APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY

------------

## MEMORANDUM OPINION[1]

------------

A jury convicted Appellant James Allen Grove of attempted capital murder and assessed his punishment at life imprisonment. The trial court sentenced him accordingly. In four issues, Appellant challenges the legal and factual sufficiency of the evidence and the trial court's order granting the State's motion to change venue. Because we hold that the evidence is legally

---

[1] *See* TEX. R. APP. P. 47.4.

and factually sufficient and that the trial court did not abuse its discretion by changing venue, we affirm the trial court's judgment.

### STATEMENT OF FACTS

The evidence shows that on the afternoon of May 21, 2006, Appellant and his dog walked down the streets of Breckenridge, Stephens County, Texas. Appellant was carrying a double-bladed ax. He told a neighbor who lived less than a block from him "that he was tired of all the electronic BS [and] that he was heading down to the police station and was going to take care of business and kill somebody." Appellant had a "normal" look on his face. After the conversation, Appellant walked south. The neighbor called the police department to report that Appellant "was coming down with an ax to take care of the electronics" and also mentioned the dog, but he did not say anything about Appellant's threat to kill anyone.

Meanwhile, Appellant told another neighbor who lived south of him and who also saw him walking down the street and carrying an ax that he was "going to go up to the police department and get rid of some of them cops down there." His demeanor was "normal." That neighbor did not have a telephone, so she drove to the courthouse to let the police know that Appellant was coming. By the time she got there, she heard gunshots, so she knew that something had already happened.

2

DPS Trooper Grant Atkinson, the complainant, was in the dispatch office of the Breckenridge Police Department when the call came in. He was wearing his uniform. Soon after the dispatcher radioed the information to other officers and requested assistance, Atkinson saw Appellant outside, on the other side of the police station's outer door. As Atkinson walked from the interior door to the outer door, he saw Appellant turn around and head away from the building. But when Atkinson exited the building, Appellant turned back around, facing him. Atkinson drew his pistol and repeatedly screamed at Appellant, who was about twelve feet away, to drop the ax. Then Appellant yelled, "Shoot me . . . [;] just shoot me."

At that point, Appellant was holding the ax over his shoulder. But as the incident progressed, Appellant "pulled the ax down in front of him, put both hands on it, and took a step towards [Atkinson]. The blade was pointing towards [Atkinson] like in a woodchopper stance, and . . . that . . . is when [Atkinson] fired [his] weapon." Appellant did not drop the ax until after the third shot.

Atkinson answered affirmatively when asked whether Appellant was close enough to him that he could have gotten to Atkinson really fast. Atkinson also testified that he was trained about a "sphere of capability," or area around him in which he needed to be careful because he could be injured before he

3

would be able to shoot, and that Appellant was within that sphere. Atkinson described Appellant's action in stepping forward with the ax as fast and aggressive but conceded that Appellant did not swing the ax at him, verbally threaten to kill him, or injure him. But Atkinson also testified that after Appellant raised the ax in an aggressive manner, he believed that Appellant was about to attack him with it, that Appellant was about to hit him with the ax, and that "[h]e could have even thrown the ax." Atkinson fired the first shot when Appellant "had positioned [the ax] in front of him with the blade pointed towards [Atkinson]."

John Williams, a firefighter who was standing behind Atkinson during the incident, testified that at first, Appellant turned around with his back to Atkinson while Atkinson still had his gun pointed at Appellant and was telling him to drop it, but then Appellant suddenly turned to face them again with the ax raised. Appellant had a "real belligerent look on his face" when he took a step towards them "with the ax raised up." He also testified that Appellant had "choked up" on the ax and was in the process of taking another step toward them before Atkinson shot him.

The crime scene investigator, a Texas Ranger, determined that Appellant had been standing about twelve and a half feet from Atkinson when Atkinson shot him and that when an edged weapon is involved, the "danger zone" is

4

considered to be a distance of twenty-one feet. He also testified that an ax is a deadly weapon.

The EMS paramedic who transported Appellant to the hospital testified that Appellant told him during the ride that his father had been shot, that now he was just like his dad, and that Appellant had gotten what he wanted.

Appellant has a history of mental illness. Evidence shows that before the offense, he had been in and out of treatment facilities from 1996 to January 2004, that he had been diagnosed with "[b]ipolar I disorder, manic phase, severe with psychotic features; caffeine-induced anxiety disorder; alcohol dependence; [and] sexual disorder, not otherwise specified," and at another time had been diagnosed with schizophrenia, paranoid-type. After the offense he was diagnosed with, "[s]chizoaffective disorder, largely remitted with treatment[, t]he most recent episode manic," a personality disorder, not otherwise specified, with paranoid traits, and "alcohol dependence in remission." There was also evidence that bipolar disorder can be controlled by medication but does not go away.

The evidence showes that Appellant had tried to hang himself while in jail in 2004. His half-brother, who lived out of state, testified that when he visited Appellant within the three years preceding trial, he found that Appellant was living in a house without running water and without enough food. Appellant

5

had torn all the water pipes out of his house after an altercation with the water department.

About two months before the offense before this court, Appellant had told a neighbor that the police and FBI had been bugging his house and had previously yelled to other neighbors "to stop sending radio waves to his mind." Appellant told the nurse who treated him while he was confined in jail for this offense that he heard voices and saw UFOs and that we have aliens on Earth.

Michael Jumes, the Director of Psychology at the North Texas State Hospital, reviewed Appellant's previous psychiatric records, and he also evaluated Appellant after the offense. Jumes testified that he believed that Appellant's mental illness is "consistent with a mental disease under . . . the statute that defines insanity" but also testified that Appellant "had the capacity to appreciate that his behavior was wrong and that it was provocative and consequently it would have consequences." Jack Price, the State's expert, testified that at the time of his evaluation of Appellant for trial, Appellant said, "I know what's right and wrong. I know the law. Shooting a gun at another person is wrong. Driving while intoxicated is wrong. Public intoxication is wrong. Assault and battery is wrong. Taking an ax to the police department is wrong. It's a deadly weapon." Price also opined,

6

[T]here was nothing, no mental illness, so severe that it would have precluded him at the time from knowing right from wrong. He did have some symptoms of mental illness. He was paranoid. He did have some really bizarre ideas, but none of them that I was able to find any evidence of had any connection to not knowing [that] taking an ax to the police department and threatening them is wrong.

**SUFFICIENT EVIDENCE TO SHOW THAT APPELLANT ATTEMPTED TO STRIKE ATKINSON**

In his second issue, Appellant contends that the evidence is legally and factually insufficient to show that he attempted to strike the complainant with an ax on May 21, 2006, as alleged in the indictment. Appellant concedes that he stepped toward Atkinson with the ax raised but claims that he did not position himself close enough to the trooper to actually hit him and that there is no evidence that he swung the ax or attempted to strike the trooper with the ax.

Section 15.01 of the penal code provides that a person commits the offense of criminal attempt if, "with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended."[2] Applying the appropriate standards of review,[3] we conclude that the evidence that Appellant brought the

---

[2] TEX. PENAL CODE ANN. § 15.01(a) (Vernon 2003).

[3] *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (both

7

ax up into a woodchopping stance and advanced on Atkinson, penetrating the danger zone, is legally and factually sufficient to show that Appellant attempted to strike Atkinson with the ax. We overrule Appellant's second issue.

### SUFFICIENT EVIDENCE OF APPELLANT'S SPECIFIC INTENT TO KILL ATKINSON

In his third issue, Appellant contends that the evidence is legally and factually insufficient to show that he specifically intended to kill the complainant on May 21, 2006. Appellant contends that he did not have the specific intent to kill anyone at the police station but instead wanted the police to kill him, as evidenced by his repeated entreaties to Atkinson and his statements to the paramedic and psychiatric professionals after the incident. In addition to this testimony, however, the jury heard that Appellant had told one neighbor that he was headed to the police station to "kill somebody" and had told another one that he "was going to go up to the police department and get rid of some of them cops down there."

Appellant also argues that the State failed to prove that he had the requisite state of mind at the time of his offense because of "the overwhelming

___

providing legal sufficiency standard of review); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005); *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (all providing factual sufficiency standard of review).

8

evidence of his diminished capacity." As the Texas Court of Criminal Appeals

has pointed out,

> Texas does not recognize diminished capacity as an affirmative defense i.e., a lesser form of the defense of insanity. In contrast, the diminished-capacity doctrine at issue in this case is simply a failure-of-proof defense in which the defendant claims that the State failed to prove that the defendant had the required state of mind at the time of the offense.[4]

The jury was the sole judge of the credibility of the evidence.[5] Based on the

evidence detailed above, and applying the appropriate standards of review,[6] we

hold that the evidence is legally and factually sufficient to show that Appellant

had the requisite specific intent to commit capital murder. We overrule

Appellant's third issue.

### SUFFICIENT EVIDENCE TO SUPPORT JURY'S REJECTION OF INSANITY DEFENSE

In his fourth issue, Appellant contends that the jury's rejection of his

insanity defense was so against the great weight and preponderance of the

evidence as to be manifestly unjust. Section 8.01(a) of the penal code provides

---

[4] *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005).

[5] *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778; *Johnson*, 23 S.W.3d at 8–9.

[6] *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778 (both providing legal sufficiency standard of review); *Watson*, 204 S.W.3d at 414; *Drichas*, 175 S.W.3d at 799; *Sims*, 99 S.W.3d at 603; *Johnson*, 23 S.W.3d at 11 (all providing factual sufficiency standard of review).

9

that "[i]t is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong."[7] Appellant alleges that he has proved by a preponderance of the evidence that he was insane at the time of the alleged offense and that he has shown that, at the time of the offense and as the result of his mental illness, he did not know that his conduct was wrong. Our review of the record, however, does not reveal any evidence that Appellant did not know that his conduct was wrong at the time of the act, nor does Appellant point to any such evidence. Based on the applicable standard of review,[8] we hold that the verdict is not so against the great weight of the evidence as to be manifestly unjust. We overrule Appellant's fourth issue.

### CHANGE OF VENUE WITHIN TRIAL COURT'S DISCRETION

In his first issue, Appellant contends that the trial court abused its discretion by granting the State's motion to change venue. Article 31.02 of the code of criminal procedure provides,

> Whenever the district or county attorney shall represent in writing
> to the court before which any felony or misdemeanor case
> punishable by confinement, is pending, that, by reason of existing

---

[7] TEX. PENAL CODE ANN. § 8.01(a) (Vernon 2003).

[8] *See Meraz v. State*, 785 S.W.2d 146, 154–55 & n.2 (Tex. Crim. App. 1990).

10

combinations or influences in favor of the accused, . . . a fair and impartial trial as between the accused and the State cannot be safely and speedily had; . . . the judge shall hear proof in relation thereto, and if satisfied that such representation is well-founded and that the ends of public justice will be subserved thereby, he shall order a change of venue to any county in the judicial district in which such county is located or in an adjoining district.[9]

We review the trial court's ruling on the State's motion to change venue for an abuse of discretion.[10]

After Appellant filed a notice of his intent to raise the insanity defense, the State filed its motion to change venue, contending that because of "existing combinations and influences in [Stephens County] in favor of [Appellant], . . . a fair and impartial trial" could not be had there. As Appellant acknowledges, a local grocery store owner testified that he thought Appellant had mental issues because he had seen Appellant riding a bicycle while wearing a dress. The witness testified that he believed others in the community held the same opinion. A legal secretary also testified that she thought Appellant had mental problems because she saw him riding a bicycle while wearing a dress. The Sheriff of Stephens County testified that most people in Breckenridge were

---

[9] TEX. CODE CRIM. PROC. ANN. art. 31.02 (Vernon 2006).

[10] *See Aranda v. State*, 736 S.W.2d 702, 705 (Tex. Crim. App. 1987), *cert. denied*, 487 U.S. 1241 (1988); *Gregory v. State*, 37 S.W. 752, 752 (Tex. Crim. App. 1896).

11

familiar with Appellant and would be predisposed to believe that he had mental health issues.

Appellant argues that "[t]he testimony elicited from the witnesses did not show any favoritism in the community on [his] behalf . . . [;] to the contrary, the opinions were that [he] was looked on with disdain and disfavor." Given his plan to raise the insanity defense, however, the Breckenridge citizens' beliefs that he had mental heath issues could reasonably be seen as "influences in favor of the accused."[11] We therefore hold that the trial court did not abuse its discretion by changing venue to Young County and overrule Appellant's first issue.

## CONCLUSION

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED:  August 26, 2008

---

[11] *See* TEX. CODE CRIM. PROC. ANN. art. 31.02.

12