NO. 07-08-0119-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

JULY 7, 2009

_____

PHILLIP W. MORRIS, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 137TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2005-410,322; HONORABLE CECIL G. PURYEAR, JUDGE[1]

_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant, Phillip W. Morris, was convicted by a jury of assault of a family member enhanced and sentenced to eight years confinement. In a single issue, he contends the State's evidence is legally insufficient to support his conviction. We affirm.

---

[1]Hon. Ron Chapman (Ret.), sitting by assignment, presiding. Tex. Gov't Code Ann. §75.002(a)(3) (Vernon 2005).

## Background

On September 28, 2005, a Lubbock County Grand Jury returned an indictment charging Appellant with assault of a family member, enhanced by a prior conviction of assault of a family member, making his offense a third-degree felony.[2] *See* Tex. Penal Code Ann. § 22.01(a) & (b) (Vernon Supp. 2008). The indictment alleged that, on February 16, 2005, Appellant assaulted his wife, Theresa Morris, by choking her, biting her, causing her to strike the floor, shaking her, and squeezing her arms.

At trial, D'Jane Brown testified that, on February 16, 2006, she lived across the street from the Morris residence. That afternoon, she went to the front door facing the street when she heard a commotion. She observed Appellant's wife, Theresa Morris, crossing the street followed by Appellant. Appellant was angry and arguing with his wife. Appellant pushed Theresa down to the ground and, after Theresa rose to her feet, they argued in a neighbor's yard. Afterwards, they went back into their house. Shortly thereafter, Theresa emerged from the house holding a puppy and hobbling. Appellant also emerged and was gesturing with his arms. She heard Theresa say loudly: "Just take me to the hospital." Appellant yelled: "No." Theresa then entered the car and moved quickly across the front seat to the passenger side attempting to leave the car. Appellant grabbed her by the hair and pulled her down onto the seat. Brown could see Appellant hovering

---

[2]The indictment also contained a felony enhancement paragraph stating Appellant had a prior felony conviction for unauthorized use of a motor vehicle. At the punishment phase, the trial court found the enhancement to be true, making the offense punishable as a second-degree felony. *See* Tex. Penal Code Ann. § 12.42(a)(3) (Vernon Supp. 2008).

over her in the car. When Brown saw Theresa's leg come up but could not see the rest of her body, she became frightened for Theresa's safety and called 911.

Theresa testified that she and Appellant had been together for seventeen years and had two sons, age fifteen and thirteen. She testified that she and Appellant were laying around the house when he grabbed their new puppy. He held the puppy "real tight." She began to cry and asked him to stop. Appellant held the puppy more tightly. She rose to leave telling him: "I don't want to see this. I just don't want to hear it. Just let her go." She testified that he never hurt the dogs–it was like a "bully thing." As she was attempting to leave the room, Appellant picked her up and threw her backwards. When she hit the floor, something in her back popped. She told him: "This time it's really hurt me. You hurt me this time."

Thereafter, she testified Appellant then picked her up and began shaking her up and down. She wanted him to let her go but he continued shaking her saying," I'm going to fix it, I'm going to fix it." She then exited the house and was getting into the car to go to the hospital when, according to her testimony, he insisted that he take her to the hospital. They began to argue and Appellant choked her with both hands while she was in the car. As a result, she almost stopped breathing. She testified that she sustained injuries from Appellant throwing her on the floor, choking her, squeezing her in a bear hug numerous times, and shaking her.

3

Theresa also testified that Appellant injured her because he was angry. She testified that he was extremely bipolar and had been suffering from the mental illness for eighteen years. On February 16, she could tell that he was being affected by his illness because he had a blank look–"like he [didn't] know what he [was] doing." She testified that, after these episodes, he couldn't recall what he had done. She testified his doctor was prescribing the wrong medications for him and that she hid his medication because he was suffering side effects such as seizures, back pain, and liver problems. Usually, when she could tell he was being affected by his mental illness, she would leave as quickly as possible. She testified that, on February 16, she just did not leave fast enough.

Rick Lewis, a corporal for the Slaton Police Department, testified he responded to Brown's 911 call. When he arrived at the Morris residence, he observed Theresa crying uncontrollably in a car parked in the driveway. Although Theresa claimed she had fallen, he was skeptical. Theresa was having a hard time standing or moving and he observed a knot on her head about the size of an egg. There was also a knot over her eye. At first, she screamed that Appellant's mother would be mad at her if Appellant went back to prison for what he had done to her. She then jumped up and started screaming that Appellant was going to pay for what he had done to her. She told Officer Lewis that Appellant had bitten her on the top of the head, choked her, picked her up in a bear hug, and shook her violently two or three times, and slammed her onto the floor on her back. Officer Lewis placed Appellant under arrest.

4

Tad Ellis, detective and felony investigator for the Slaton Police Department, arrived at the Morris residence after Lewis. He testified Theresa was crying and complaining of lower back pain. At one point, Theresa became confrontational with Appellant and yelled that she was not going to take it anymore. She also told Detective Ellis that she did not want to press charges. He testified that it was not uncommon for a victim of domestic violence to not want to press charges.

The jury convicted Appellant of the charges in the indictment, the trial court assessed punishment, and this appeal followed.

## Discussion

Appellant contends the State failed to offer legally sufficient evidence to establish beyond a reasonable doubt that Appellant engaged in the assaultive conduct voluntarily and with the requisite culpable mental state. Appellant asserts he was unaware of his actions due to a bipolar episode which was precipitated by being deprived of his medications by his wife. Accordingly, he contends that his actions were involuntary and that he lacked the requisite criminal intent.

## I.      Standard of Review - Legal Insufficiency

It is a fundamental rule of criminal law that one cannot be convicted of a crime unless it is shown beyond a reasonable doubt that the defendant committed each element of the alleged offense.  U.S. Const. amend. XIV; Tex. Code Crim. Proc. Ann. art. 38.03 (Vernon Supp. 2008); Tex. Penal Code Ann. § 2.01 (Vernon 2007).  In a sufficiency of the evidence review, the essential elements of the offense are those of a hypothetically correct jury charge for the offense in question (i.e., one that accurately sets out the law and adequately describes the offense for which the appellant was tried without increasing the state's burden of proof or restricting the state's theory of criminal responsibility).  *Hooper v. State,* 214 S.W.3d 9, 14 (Tex. 2007); *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997).

In assessing the legal sufficiency of the evidence to support a criminal conviction, a reviewing court must consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences to be drawn therefrom, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);  *Hooper,* 214 S.W.3d at 13.  In our analysis, we must give deference to the responsibility of the jury to fairly resolve conflicts in testimony,  weigh the evidence, and draw reasonable inferences from that evidence.  *Id.*

Circumstantial evidence alone is sufficient to establish an element of the offense and the sufficiency standard of review is the same for both direct and circumstantial evidence cases. *Hooper,* 214 S.W.3d at 13. Each fact need not point directly and independently to the guilt of the accused, so long as the cumulative force of the probative evidence, when coupled with reasonable inferences to be drawn therefrom, is sufficient to support the conviction. *Evans v. State,* 202 S.W.3d 158, 166 (Tex.Crim.App. 2006).

## II. Legal Sufficiency–Assault of a Family Member

A person commits the offense of assault of a family member if he or she intentionally, knowingly, or recklessly caused bodily injury to a family member. See Tex. Penal Code Ann. § 22.01(a)(1) (Vernon Supp. 2008).[3] Because the statute expresses three culpable mental states in the disjunctive, proof of any one of the three is sufficient to support a conviction. *Perez v. State*, 704 S.W.2d 499, 501 (Tex.App.–Corpus Christi 1986, no pet.).

"A person acts intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result." Tex. Penal Code Ann. § 6.03(a) (Vernon 2003). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the

---

[3]Appellant does not deny that Theresa qualifies as a family member, nor does he contest that he caused her bodily harm.

7

result." Tex. Penal Code Ann. § 6.03(b) (Vernon 2003).[4] A culpable mental state may be inferred from circumstantial evidence such as acts, words, and conduct of the defendant and surrounding circumstances. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004).

"Texas law, like that of all American jurisdictions, presumes that a criminal defendant is sane and that he intends the natural consequences of his acts." *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex.Crim.App. 2008). Further, Texas does not recognize diminished capacity as an affirmative defense, i.e.*,* a lesser form of the defense of insanity. *Jackson v. State,* 160 S.W.3d 568, 573 (Tex.Crim.App. 2005).[5] The diminished capacity doctrine at issue here is "simply a failure-of-proof defense in which [Appellant] claims that the State failed to prove that [he] had the required state of mind at the time of the offense." *Id.* This doctrine does not permit the defense to argue that he does not have the capacity, or is absolutely incapable of forming the frame of mind. *Id.* at 574-75; *Mays v. State*, 3223 S.W.3d 651, 654 (Tex.App.–Texarkana 2007, no pet.). Rather, evidence of a mental disease or defect may be offered to rebut or disprove the State's evidence establishing the defendant's culpable *mens rea*. *Ruffin*, 270 S.W.3d 586; *Jackson*, 160 S.W.3d at 574-75.

---

[4]Because we ultimately find the evidence is legally sufficient to support a finding that Appellant acted "intentionally" or "knowingly," we need not discuss the definition of "recklessly."

[5]The affirmative defense of insanity excuses the person from criminal responsibility even though the State has proven every element of the offense, including the *mens rea*, beyond a reasonable doubt. *Ruffin*, 270 S.W.3d at 592. The test for determining insanity is whether, at the time of the conduct charged, the defendant did not know his conduct was "wrong" because of a severe mental disease or defect. *Id.* Appellant did not assert an insanity defense at trial.

As with other evidence, it is up to the jury to hear the evidence, determine its weight, and decide whether Appellant possessed the requisite *mens rea* to commit this offense. *Id*. at 574.

Here, Appellant argues that the State failed to offer any evidence he acted voluntarily or possessed a culpable mental state. We disagree. Appellant's initial violent outburst was "set off" by Theresa's reaction to an activity Appellant often engaged in–bullying their dogs. Angered by her reaction, Appellant threw her against the floor. He was aware of the fact that his actions caused Theresa injuries because, afterwards, he tried to "fix it." Thus, a jury could reasonably infer that Appellant was not under the influence of a bipolar episode, but rather acted voluntarily and possessed a culpable mental state.

When Theresa was able to exit the house, she testified that Appellant insisted that he take her to the hospital. Another sign that he was aware of the consequences of his actions, i.e., he had injured Theresa. When she refused his offer, he again became angry, attacked her in the car, and began choking her. The impetus for this second attack being her refusal to permit him to drive her to the hospital. Finally, after this attack, Theresa did not blame Appellant's bipolar condition when speaking with police officers but asserted she had fallen, that Appellant's mother would be mad if her son went to prison for what he had done, and threatened that Appellant would pay for what he had done.

9

This evidence, when viewed in a light most favorable to the prosecution, is sufficient to enable a rational jury to find, beyond a reasonable doubt, the essential elements of assault of a family member. *See Schumacher v. State*, 814 S.W.2d 871, 873 (Tex.App.–Austin 1991, no pet.). Thus, the evidence is legally sufficient to support the jury's verdict of guilty.

Appellant's single issue is overruled.

## Conclusion

The trial court's judgment is affirmed.

Patrick A. Pirtle
Justice

Do not publish.