

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00497-CR

_____

WILLIAM STEVENS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. F17-129-158

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

Appellant William Stevens appeals his conviction for murder. *See* Tex. Penal Code Ann. § 19.02. In a single issue, Stevens complains of the trial court's refusal to allow his expert witness to testify that Stevens's mental condition left him without the capacity to act knowingly or intentionally. Because such testimony is inadmissible in accordance with court of criminal appeals' precedent prohibiting a diminished-capacity defense, we affirm the trial court's judgment.

## Background

Stevens stomped a woman to death outside of a Denton Salvation Army. During the trial but in a hearing outside the jury's presence, the trial court ruled that Stevens's expert witness, psychologist Charles Keenan, could not testify to a "direct connection" to Stevens's mental defects or delusions that would negate Stevens's criminal intent. Dr. Keenan then testified in front of the jury to his evaluation of Stevens and his observations, which included testimony that:

- Dr. Keenan found Stevens "to be very limited in his verbal capacity, very limited in his capacity for understanding."

- Stevens's IQ was 63, within the range of intellectual disability, also known as mental retardation. Dr. Keenan explained that this low IQ score meant Stevens was likely "severely challenged in learning how to do anything and particularly challenged in any capacity to reason abstractly or conceptually or to have . . . continuous memory."

- Dr. Keenan diagnosed Stevens with schizoaffective disorder, meaning he was prone to "hallucinations, both auditory[—]hearing things that aren't there, hearing people speaking[—] and visual hallucinations[—]seeing things occur

2

around them that don't exist in reality. And also, maybe and more importantly, they're also prone to what is referred to as delusions."

- Dr. Keenan diagnosed Stevens with bipolar disorder, meaning he has "an unstable mood between pretty extreme highs and sometimes very severe lows." Dr. Keenan explained, "So in [Stevens's] case, he has the double whammy. He has the disturbed disorder thinking and distorted perceptions and also a mood that is severely disordered."

- Stevens has addiction and abuse issues with alcohol, methamphetamine, and prescription drugs. The methamphetamine use and prescription-drug abuse would exacerbate schizoaffective disorder when Stevens was under prolonged stress.

- Stevens was "significantly developmentally delayed as a child" and diagnosed with Attention Deficit Disorder as a child.

- Stevens had had suicidal ideations in the past and received inadequate mental-health treatment.

- On the day of the murder and before attacking the victim, Stevens made suicidal statements and statements indicating that "he was convinced that his family was being killed or had been killed and that he was lost and overwhelmed."

- Stevens was not able to tell Dr. Keenan much about how the victim was injured, but that the woman "had his mother's and family's clothes and possessions and that she had killed his family. And that made him mad." Stevens told Dr. Keenan that he hit and choked the woman and then ran away. Dr. Keenan testified that there was no indication the decedent had any of Stevens's family's possessions and that was part of Stevens's delusion.

- By the time of trial, Stevens was on a number of "major" antipsychotic medications.

- In Dr. Keenan's opinion, Stevens should not be out "walking around in society free," but he needs a secure medical facility with ongoing psychiatric treatment and supervision. Dr. Keenan believed that Stevens did not have the capacity to independently function.

After presenting this testimony to the jury, Stevens's attorney attempted to ask

Dr. Keenan whether Stevens's mental-health issues would "affect [his] ability to act

3

knowingly," "negate [his] ability to act intentionally," and "negate [his] ability to act knowingly." The State objected to each of these questions based on the trial court's prior ruling, and the trial court sustained the objections. Later, outside the presence of the jury, Stevens's attorney presented an offer of proof, during which he asked Dr. Keenan how Stevens's mental-health issues would affect Stevens's "ability to act intentionally" and "ability to act knowingly," and whether they would "negate" his ability to act intentionally and knowingly. Dr. Keenan responded that he believed Stevens's "severe" mental defects, which caused delusions and hallucinations, could affect Stevens's ability to act intentionally and knowingly.

The jury found Stevens guilty of murder and the trial court sentenced him to sixty-two years' confinement.

## Discussion

On appeal, Stevens argues that the trial court abused its discretion by precluding Dr. Keenan from testifying to whether Stevens's mental illnesses negated his ability to act intentionally or knowingly. We review the trial court's exclusion of the testimony for an abuse of discretion. *See Montgomery v. State*, 810 S.W.2d 372, 378–79 (Tex. Crim. App. 1990) (op. on reh'g).

Texas does not have a "diminished capacity" defense as a lesser form of the insanity defense. *Mays v. State*, 318 S.W.3d 368, 380–81 (Tex. Crim. App. 2010); *Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008); *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005). Relevant evidence, including a history of mental illness,

4

may be presented which the jury may consider to negate the mens rea element of the crime, but it may not be admitted to show that the defendant did not have the capacity to form the mens rea. *Jackson*, 160 S.W.3d at 574–75.

The court of criminal appeals provided in *Ruffin* an apt illustration of mental-defect evidence that is admissible to rebut or disprove mens rea:

> [B]oth physical and mental diseases or defects may affect a person's perception of the world just as much as they may affect his rational understanding of his conduct or his capacity to make moral judgments. For example, suppose that a blind person is sitting on his front porch and hears what he thinks is a trespasser coming up his walk. He shoots at the person to scare him away, knowing that it is illegal to shoot at people, even trespassers. The "trespasser" turns out to be a uniformed police officer who is coming to serve a subpoena. The blind man may be prosecuted for aggravated assault with a deadly weapon, but he cannot be convicted of aggravated assault of a police officer if, because of his blindness, he did not see the uniform and did not know that the person was a police officer. Evidence of the defendant's blindness would, of course, be relevant and admissible to rebut the State's assertion that the defendant intended to shoot at a police officer. Such evidence might be elicited from the defendant, a lay witness—mother, brother, friend, or neighbor—or from an expert, an optometrist, physician, etc. Courts routinely admit evidence of a physical abnormality offered to prove a lack of *mens rea.*

> In Texas, the same rule applies to evidence of a mental disease or defect offered to rebut or disprove the defendant's culpable *mens rea.* If, instead of blindness, the defendant suffers from mental delusions such that he sees a "trespasser" or a "Muslim" when everyone else around him sees a police officer, he cannot be convicted of intentionally shooting at a police officer, although he may be convicted of intentionally shooting at a trespasser or Muslim. Guilt of the greater offense requires that the State prove, beyond a reasonable doubt, that the defendant intended to shoot a police officer, not a trespasser or Muslim. That is the required *mens rea* and that is the State's constitutional burden of proof.

5

*Ruffin*, 270 S.W.3d at 593–94 (internal citations omitted). The court held that the evidence explaining "appellant's mental disease and when and how paranoid delusions may distort a person's auditory and visual perceptions is admissible as it relates to whether appellant intended to shoot at police officers[, which was necessary to elevate the crime to aggravated assault on a public servant]." *Id.* at 597. The sort of evidence addressed in *Ruffin* was permitted by the trial court in this case—the jury heard about Stevens's mental conditions of psychoaffective disorder and bipolar disorder, how they cause delusions and hallucinations, and how those delusions and hallucinations affected Stevens's behavior.

On the other hand, the excluded testimony is more akin to the argument put forth in *Jackson* by attempting to go a step further and provide an excuse for Stevens's actions. *See Jackson*, 160 S.W.3d at 574–75. In *Jackson*, the court of criminal appeals upheld the lower court's decision not to allow the defense to argue that the defendant, because of his mental condition, lacked the capacity to form the requisite intentional and knowing mens rea to be convicted of murdering his brother. *Id.* at 569–70. The court of criminal appeals explained,

> Appellant attempted to negate [the State's evidence that he intentionally and knowingly caused his brother's death] by introducing evidence of his history of mental illness through the testimony of his mother and sister, as well as the defense expert witness, Dr. Grigson. Appellant himself testified about his frame of mind on the night of the offense. The jury was able to hear all of this evidence, determine the weight of the evidence, and choose whether or not Appellant possessed the requisite *mens rea* to commit this offense. The jury believed that he did. The only thing Appellant was prevented from doing is arguing that the jury should

find that he did not have the capacity to make the decision to intentionally and knowingly cause bodily injury and thus should find him not guilty. **However, presenting evidence of mental illness does not then allow the defense to argue that the defendant is absolutely incapable, i.e., does not have the capacity to intentionally or knowingly perform an act.**

*Id.* at 574–75 (emphasis added). *See also Acevedo v. State*, No. 02-10-00187-CR, 2011 WL 5607630, at *1 (Tex. App.—Fort Worth Nov. 17, 2011, pet. ref'd) (mem. op., not designated for publication) (holding that trial court did not abuse its discretion by excluding expert testimony offered to demonstrate that a defendant lacked the capacity to form the requisite mens rea).

The proffered testimony in this case similarly attempted to establish that Stevens, because of his mental-health issues, did not have the capacity to intentionally or knowingly commit murder:

> Q       Dr. Keenan, would those mental health issues, delusions, hallucinations, everything you've testified about, would that negate - - and that is n-e-g-a-t-e - - would that negate the Defendant's ability to act intentionally?
>
> A       It could, yes.
>
> Q       Would his mental health issues, in fact, negate the Defendant's ability to act knowingly?
>
> A       Yes.

In line with *Jackson* and the precedent of our own court, this testimony was properly excluded by the trial court. *Jackson*, 160 S.W.3d at 573–74; *Acevedo*, 2011 WL 5607630, at *1. To hold otherwise would constitute an implicit recognition of a diminished-capacity defense, contrary to firmly established precedent. *Acevedo*, 2011

7

WL 5607630 at *1; *see also Mays*, 318 S.W.3d at 380–81; *Ruffin*, 270 S.W.3d at 593; *Jackson*, 160 S.W.3d at 573–74.  We therefore overrule Stevens's only issue.

## Conclusion

Having overruled Stevens's issue on appeal, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  December 12, 2019