

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,750

### ADAM KELLY WARD, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 23,182 IN THE 354th DISTRICT COURT
### HUNT COUNTY

**KEASLER, J., delivered the unanimous opinion of the Court.**

### O P I N I O N

Adam Kelly Ward was convicted in June 2007 of capital murder.[1] Based on the jury's

answers to the special issues,[2] the trial judge sentenced Ward to death.[3] Direct appeal to this

---

[1] TEX. PENAL CODE ANN. § 19.03(a).

[2] TEX. CODE CRIM. PROC. ANN. art 37.071 §§ 2(b), 2(e)

[3] TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(g).

Court is automatic.[4]  We conclude that Ward's five points of error are without merit. Consequently, we affirm the trial court's judgment.

**Facts**

Ward was convicted of intentionally murdering Michael Walker while in the course of committing obstruction or retaliation.[5]

Ward's family was cited numerous times for failing to comply with Commerce City's housing and zoning codes.  At one time, a "demolish order" was issued on the Wards' home, but the Wards eventually agreed to comply with the codes governing their property.  As a result of the most recent violation—the presence of unsheltered storage—the City imposed a clean-up deadline of June 11, 2005, or a non-compliance case would be filed with the municipal court.   The Wards did not comply with the notice letter.

At 10:00 a.m. on June 13, 2005, Walker, a City of Commerce Code Enforcement Officer, went to the Ward property to record the continuing violation.  Walker wore his City of Commerce work shirt and drove a marked City of Commerce truck.  Walker was unarmed, carrying only his digital camera.  Ward was washing his car in the driveway when Walker arrived.

After parking his truck, Walker walked the perimeter of the Ward property and took pictures.  At some point, Walker and Ward began arguing.  Ward's father came outside and

---

[4] TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(h).

[5] TEX. PENAL CODE ANN. § 19.03(a)(2).

attempted to calm the men down. Ward then sprayed Walker with water from the hose that he was using to wash his car. Walker used his cell phone to call his office and request an officer's assistance. Ward's father tried to reason with Walker and told him, "We need to sit down and talk about this." But Ward's father became concerned when he noticed that Ward was no longer outside and advised Walker that it might be "best if he left the property." Ward's father then ran to look for Ward, as he believed that Ward had a gun in his room. Ward's father did not warn Walker about this fact.

Walker put his camera in the back of his truck and waited for the officer dispatched to assist him. However, before Ward's father could intervene, Ward, armed with a .45-caliber pistol, ran out of the house toward Walker and fired at him. Walker tried to use his truck as cover but Ward pursued him, chasing him around the truck at least twice, firing the gun again. Walker then ran back towards the Ward home. While in pursuit, Ward shot Walker several times. Walker finally fell across the sidewalk, and Ward shot him again at close range. The medical examiner later determined that Walker sustained nine gunshot wounds. After Walker fell down, Ward's father was able to take possession of the gun from Ward along with the empty magazine and another fully-loaded clip.

In his confession, Ward stated that he believed that the "City" was after his family and that he had previously been beaten up by the local police. He believed that the police would kill him if he were arrested again. When Walker arrived, Ward thought that Walker was a "bad ass, hot head," and he believed that Walker and the former Code Enforcement Director,

Fred Eaton, had "threatened to tear down our house." While Walker was taking pictures, Ward said that he and Walker got into an argument about how Walker had parked his truck on the street. Ward stated that Walker then started walking up to him "showing attitude," so Ward sprayed him with the hose. Ward claimed that, after he sprayed Walker with the hose, he was in fear of Walker, "just the way he was walking up. He threatened to call the cops and have—press charges on me and all." Ward stated that he was in fear for his life because, if the cops showed up to arrest him, he would probably end up dead. Ward said he got his gun for "self defense" and initially just meant to scare Walker, but he admitted that he knew he "emptied a magazine" at him. He confessed that he "overreacted" to the situation. There was no evidence presented confirming Ward's claims that he had ever been beaten by the police.

**Mental Health Evidence**

In Ward's first three points of error, he contends that the trial judge erred in limiting evidence of his mental impairment at the guilt phase. After the State rested, Ward offered testimony from forensic psychologist Dr. Kristi Compton and psychiatrist Dr. Heidi Vermette, both of whom had testified during Ward's competency trial and had also prepared mitigation reports. Ward wanted to use their testimony not to show that he was legally insane, but to negate the *mens rea* of the aggravating factors of obstruction or retaliation,

which elevated the crime to capital murder.[6] Ward argues that the doctors' testimony would show that he did not intentionally commit obstruction or retaliation because he believed that he was acting in defense of himself, his family, and his home. However, Ward did not raise self-defense, and he concedes that a "diminished capacity" defense does not exist in Texas.[7] Ward does not dispute that he was guilty of intentionally murdering Walker.

A defendant's right to present a defense includes the due-process right to the admission of competent, reliable, exculpatory evidence to rebut any element of the offense.[8] As with other elements of the offense, the *mens rea* element may be negated by relevant evidence, and this evidence may sometimes include evidence of a defendant's mental illness.[9] However, such evidence may be excluded under Rule 403 if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[10] Such evidence may also be excluded if it does not actually negate the applicable *mens rea*.[11]

---

[6] *See id*.

[7] *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) (Texas has not enacted any affirmative defenses, other than insanity, based on mental disease, defect, or abnormality).

[8] *Id.* at 594.

[9] *Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005).

[10] *Id.* at 574; TEX. R. EVID. 403.

[11] *Ruffin*, 270 S.W.3d at 596.

Here, Ward wished to present evidence to negate the required *mens rea* of obstruction or retaliation. A person commits the offense of obstruction or retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act:

(1) in retaliation for or on account of the service or status of another as a:
    (A)    public servant, witness, prospective witness, or informant; or
    (B)    person who has reported or who the actor knows intends to report the occurrence of a crime; or
(2) to prevent or delay the service of another as a:
    (A)    public servant, witness, prospective witness, or informant; or
    (B)    person who has reported or who the actor knows intends to report the occurrence of a crime.[12]

The trial judge held a hearing outside the jury's presence to determine the relevancy and admissibility of Ward's proffered testimony. To prevent the State from previewing the defense's mitigation case, the trial judge agreed to review the defense's witness lists and Compton's and Vermette's reports *in camera*. Ward presented the doctors' reports as a proffer of what their testimony would be at guilt phase of trial. If the trial judge found the evidence relevant, the reports would be given to the State so it would have the opportunity to make both relevancy and admissibility objections. If the trial judge found otherwise, the reports would be sealed for appellate review. Following his review of the reports, the trial judge determined that Compton's testimony was inadmissible as it was not relevant "to any issue in the [guilt] phase of trial." On the other hand, the trial judge found that a specific portion of Vermette's report was admissible and her testimony would be limited to that

---

[12] *See* TEX. PENAL CODE ANN. § 36.06(a).

portion of her report. All evidence ruled inadmissible was sealed for appellate review.

The State argues that the prosecutor should not have been denied access to the expert reports during the hearing and that Ward violated a pretrial order by not providing the reports earlier. However, even though the trial judge took protective measures, it appears that the State was provided with both reports before trial, as the prosecutor referenced actual pages of the reports during the hearing.

Vermette testified that, based on her review of Ward's extensive records, testing and interviews with Ward, and interviews with his family and counsel, Ward suffers from "mental illness that's best described as psychotic disorder, not otherwise specified, obsessive compulsive personality disorder, and anti-social personality disorder." She further testified that Ward's psychotic disorder causes disorganized speech and causes him to suffer paranoid delusions such that he believes there might be a conspiracy against him and that people might be after him or trying to harm him. Finally, she testified that Ward was suffering from this psychotic disorder on the date of the offense. The trial judge provided a lesser-included instruction on murder in the jury charge.

In point of error one, Ward asserts that the trial judge reversibly erred in excluding Compton's testimony. He argues that Compton's testimony was essential to persuade the jury that "when Ward attacked Walker, he was consciously motivated only by his delusional beliefs that Walker was attacking him." Compton's report discussed Ward's entire background and history, described his delusional system, and concluded that Ward "lacked

the requisite *mens rea* to form intent."

Ward argues that he did not intend to use the evidence to show that he was incapable of ever forming the intent necessary to commit capital murder, only that he did not have the *mens rea* to commit obstruction or retaliation. Ward concedes that our holding in *Jackson v. State* does not allow the defense to argue that the defendant is absolutely incapable, *i.e.*, does not have the capacity to intentionally or knowingly perform an act.[13] Rather, Ward asserts that he was "attempting, through expert testimony, to negate the *mens rea* requirement by showing that [he] did not act in retaliation, but rather out of a delusional belief that he was under attack by an employee of the City of Commerce."

We review a trial judge's decision to admit evidence under an abuse of discretion standard.[14] A trial judge abuses his or her discretion only when the decision lies "outside the zone of reasonable disagreement."[15] If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial judge when the ruling was made, then we will uphold the judgment.[16]

Here, Ward told the trial judge that he was not raising self-defense and that he was not

---

[13] 160 S.W.3d at 574-75.

[14] *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007); *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

[15] *Id.*; *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992).

[16] *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *Romero v. State*, 800 S.W.2d 539, 543-44 (Tex. Crim. App. 1990).

challenging his intent to murder Walker. Further, he did not raise an insanity defense. Instead, Ward challenged only his *mens rea* to commit the aggravating offense of obstruction or retaliation.

The record shows that Compton's report focuses on her opinion that Ward's paranoid delusions were created by, and learned from, Ward's father. This, in conjunction with Ward's psychosis, led Ward to believe that most members of the Commerce City government were out to get his family. This delusion led him to believe that he was being attacked by Walker—a city employee. Therefore, Ward responded in a manner consistent with his delusion. Compton concludes that Ward "lacked the requisite *mens rea* to form intent." Compton then defines "intent" as "a rational and cohesive thought pattern in which a person is able to regulate their thought patterns and express their behavior in congruence with their thoughts." Ward relies on Compton's opinion that he did not form the "intent" to obstruct or retaliate.

Texas Penal Code Section 6.03 defines "intentional" and "knowingly" as follows:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Under the statutory definition, Compton's report does not negate the required *mens rea* for retaliation or obstruction. Instead, her report merely provides an explanation for the motive

behind Ward's retaliation or obstruction of Walker—that Ward was indoctrinated over time to distrust the government and to believe there was a conspiracy to get his family. Consequently, Compton's report reinforces the theory that Ward attacked Walker because Walker worked for the City or because he wanted to stop Walker from calling the authorities.[17]

As in *Jackson*,[18] the evidence Ward proffered presented only an excuse for the crime: that Ward intentionally killed Walker because he was so paranoid that he thought Walker, as a city employee, was out to get him. As we explained in *Jackson*, Texas law does not recognize such an excuse.[19] Further, under Rule of Evidence 403, Compton's testimony could have been overly confusing or misleading to the jury. The jury was charged with applying the statutory definition to the facts of the case, and Compton's definition of "intent" varied significantly from the statutory definition. Therefore, we conclude that the trial judge did not abuse his discretion by excluding Compton's report or testimony. Point of error one is overruled.

In Ward's second point of error, he complains that the trial judge erred in limiting

---

[17] *Cf. Ruffin*, 270 S.W.3d at 596 (at trial for aggravated assault on a public servant, mental health evidence admitted to show that, due to his delusions, defendant believed he was shooting at Muslims, not police, because it was relevant to show defendant did not intend to shoot a police officer).

[18] 160 S.W.3d at 572 (*mens rea* of murder not negated by evidence that defendant killed his brother because he was so paranoid that he thought his brother was out to get him).

[19] *Id.*

Vermette's testimony at the guilt phase. Specifically, he argues that Vermette should have been allowed to testify regarding Ward's specific delusions at the time of the offense and how those delusions affected his mental state with regard to his intent to retaliate or obstruct. We do not need to reach the merits of Ward's claim because it was not preserved for review.

To preserve a complaint for appellate review, a defendant must specifically object and then either secure a ruling or object to the court's refusal to issue a ruling.[20] At the hearing, Ward proffered Vermette's report as a representation of her proposed testimony. The trial judge ruled:

> I am prepared to consider Dr. Vermette's testimony in the limited capacity of the clinical impressions regarding mental illness with some guidelines and caveats. One, only as to the symptoms of such orders—or disorders and only how they might affect the obstruction and retaliation issues, not the murder issues.
>
> And that no opinions be expressed as—obviously as to competency but as to the *mens rea* intent or the effect on the *mens rea* intent.

The trial judge then noted that Vermette's testimony would be limited to two and one-half pages of her report, starting at page nineteen. At this point, not only did Ward not object to the trial judge's ruling, but counsel stated, "I appreciate your ruling and I respect it and whatever." Counsel also informed the trial judge that there was nothing else that they needed to discuss outside the presence of the jury.

After Vermette's testimony on voir dire, the trial judge ruled that Vermette could testify regarding: (1) any mental impairment or mental illness that she found in Ward when

---

[20]T EX. R. APP. PROC. 33.1(a).

she examined him; (2) whether, based on her professional knowledge, experience, and what she had reviewed, any of those illnesses and their symptoms existed on June 13, 2005; and (3) explanations of "a particular symptom, what it does, whether it causes delusions or what kind of behavior it may cause." Again, Ward did not object. Then, with Ward's consent, to prevent the jury from considering the evidence for insanity or competency, the trial judge gave the following limiting instruction prior to Vermette's testimony:

> And that is, Ladies and Gentlemen, that the testimony of [Vermette] is admitted for the sole purpose of assisting the Jury, if it does, in determining what mental impairments or illness, if any, [Ward] had on June 13, 2005. And if he had any, how, if at all, those impairments or illnesses influenced the mental state of [Ward] on June 13, 2005. And it is admitted for no other purpose.

Next, even if Ward had preserved his claim, we would find no abuse of discretion. Vermette, herself, testified on voir dire that her report was not done for the purposes of trying to look back and see what Ward's "mental state" was on the date of the offense. She stated that she could not form an opinion about Ward's mental state at the time of the offense, but she could testify about how his perception of reality is distorted by his mental illness and that he had the same illness at the time of the offense—the testimony ultimately presented before the jury. Point of error two is overruled.

In Ward's third point of error, he posits that his Fourteenth Amendment federal due-process rights were violated by the exclusion of Compton's testimony and the limitation of Vermette's testimony. Ward assumes that the trial judge erred in excluding or limiting the evidence. As we have already held that the trial judge did not err, Ward's due-process rights

were not violated. Additionally, we note that the United States Supreme Court has held that there is no due-process violation when all "mental disease" evidence at the guilt phase is excluded when it is offered to rebut the *mens rea* element.[21] Therefore, point of error three is overruled.

### Death-Penalty Scheme

In point of error four, Ward contends that the Texas death-penalty scheme is unconstitutional because it fails to provide uniform, statewide standards to guide prosecutors in their decisions to seek the death penalty. He argues that this failure violates his rights under the Equal Protection Clause to the Fourteenth Amendment. We have previously rejected the notion that there should be "a statewide policy or standard for determining in which cases the State will seek the death penalty as opposed to leaving the decision in the hands of the individual district attorneys."[22] Ward relies upon *Bush v. Gore*,[23] but we have rejected the argument that a disparity in death-penalty decision making from county to county violates the principles articulated in that decision.[24] Point of error four is overruled.

In Ward's fifth point of error, he contends that Texas's capital-sentencing statute

---

[21] *Clark v. Arizona*, 548 U.S. 735, 779 (2006).

[22] *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); *Crutsinger v. State*, 206 S.W.3d 607, 611-13 (Tex. Crim. App. 2006); *Hankins v. State*, 132 S.W.3d 380, 387 (Tex. Crim. App. 2004).

[23] 531 U.S. 98 (2000).

[24] *Roberts*, 220 S.W.3d at 535; *Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004).

impermissibly prevented the jury from giving meaningful consideration and effect to his constitutionally relevant mitigating evidence under *Penry v. Lynaugh* (*Penry I*).[25] He argues that the statute is both contrary to and is an "unreasonable application of clearly established Federal law." Ward then mistakenly avers that he received jury instructions similar to those in *Penry I*: (1) whether he had committed the offense deliberately, and (2) whether it was probable that he would commit future violent acts constituting a continuing threat to society. He argues that his trial was "flawed by the same constitutional error" as in *Penry I*.

Because Ward committed this offense after September 1, 1991, the trial judge gave the jury instructions set out in the current version of Article 37.071: (1) whether he is a future danger, and (2) "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."[26] The jurors were also instructed that they did not need to agree on what particular evidence they found to be mitigating in order to answer the second special issue, "yes."[27]

We have previously considered the current capital-sentencing statute in light of *Penry*

---

[25] 492 U.S. 302 (1989).

[26] T EX. CODE CRIM. PROC. ANN. art. 37.071 §§ 2(b)(1), 2(e)(1).

[27] T EX. CODE CRIM. PROC. ANN. art. 37.071 § 2(f)(3).

*I* and have repeatedly held that the instructions allow jurors to give meaningful consideration and effect to mitigating evidence in accordance with clearly established federal law.[28] Ward provides us with no new argument that persuades us to reconsider our holdings. Point of error five is overruled.

We affirm the trial court's judgment.

DELIVERED: February 10, 2010
DO NOT PUBLISH

---

[28] *See Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Saldano v. State*, 232 S.W.3d 77, 107-09 (Tex. Crim. App. 2007).