# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00070-CR

**Kelley Saveika, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 7 OF TRAVIS COUNTY
### NO. C-1-CR-07-503140, HONORABLE ELIZABETH ASHLEA EARLE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Kelley Saveika guilty of cruelty to animals. *See* Tex. Penal Code Ann. § 42.092(b)(3) (West 2011). After electing to have the trial court set punishment, Saveika received ninety days of confinement, suspended pending eighteen months of community supervision. Saveika filed a motion for new trial, which the court denied. On appeal, she raises two points of error, arguing that she was selectively prosecuted and denied effective assistance of counsel at trial. We affirm the trial court's judgment.

## BACKGROUND

In 2006, Saveika began volunteering with an animal rescue group called Siamese Rescue. As a member of that group, Saveika provided foster care to cats from the city-operated animal shelter, Town Lake Animal Center (TLAC), that were at risk of being euthanized. Eventually, Saveika established her own rescue operation, "Rescuties," which she operated out of her Austin

home.  Once TLAC approved Rescuties to provide foster care, the shelter contacted Saveika directly about at-risk cats.[1]

**The investigation and seizure**

In 2007, the Austin Police Department (APD) received a report of possible animal cruelty from Emancipet, an organization that operates a low-cost preventative veterinary clinic where Saveika had been bringing cats.  Detective Karen Duncan began an investigation and, upon searching the records system at TLAC, learned that Saveika had taken over ninety cats from the shelter on behalf of "Rescuties" in a seven-month period.  After meeting with Saveika's private veterinarian and with the staff at the Emancipet clinic, Duncan went to Saveika's home to discuss the matter.  Although Saveika was not at home, Duncan noticed an odor of urine and feces from outdoors and viewed some cats and debris through the windows.  Duncan obtained a warrant to seize the animals in the home.

On November 8, 2007, APD executed the warrant for the seizure.  Duncan met Saveika at her front door, informed her of the warrant, and entered the home.  While the other officers waited outside, Duncan used a video camera to record the conditions.  She found the apartment overrun by cats and full of clutter and filth including cat urine and feces, much of it diarrhea, on almost every surface.  Half of the floor in one bedroom was "squishy wet" with urine.  An overpowering ammonia odor caused Duncan's eyes to sting and irritated her throat.  The officers outside found the odor to be noticeable from a distance of sixty feet.

---

[1]  The facts recited herein are taken from the testimony and exhibits admitted at trial and at the hearing on Saveika's motion for new trial.

After Duncan completed her video, the waiting officers entered Saveika's home to seize the animals. According to the officers, the inside of the home was covered in debris, urine, and feces; was lacking in clean water; and was full of visibly sick or dying cats. Overturned furniture, computers, garbage, food, and clothing were scattered everywhere. While there were several litter boxes in the apartment, these were "way overused, full, without having been cleaned." The officers saw only a few sources of water, all of which were contaminated with food or feces or covered in an oily film. There were numerous cats moving through the apartment, some in cages, and others shut in a bathroom. The officers saw discharge from the nose and eyes of many cats and heard a loud wheezing noise coming from at least one; another cat had what looked like a severe eye injury. Inside a bathroom cabinet, Duncan discovered one obese cat that "looked like it was nearly dead" and "could barely move." Finally, on a second pass through the apartment to ensure no additional cats were hiding, the officers found a dead cat.

Ultimately, APD and animal control removed the dead cat and forty-seven living cats from the apartment. The living cats were taken to TLAC, where the obese cat from the bathroom cabinet died during the first night after the cats were seized. Eventually, the surviving cats were all transferred to rescue groups or adopted. Saveika was arrested and charged with cruelty to animals. *See id.* § 42.092(b)(3).

**The trial**

At Saveika's trial before a jury, the State presented testimony from Duncan and other officers about the investigation and seizure, and the photographs and video they had taken were admitted into evidence. The State also called two witnesses to testify to the condition of

3

Saveika's cats in the months prior to the seizure. Dr. John Samon, a veterinarian with a private practice in Austin, treated about thirty of Saveika's cats over a two-year period. Samon testified that the health of the cats grew "much, much worse" over the course of the fifty to seventy visits Saveika made to his office. Samon at one point instructed Saveika that all cats need fresh, ample water and clean litter boxes and explained that failing to provide these could cause dehydration, malnutrition, the spread of disease, and even death. Samon testified that Saveika understood these ramifications and assured him that she was complying with his instructions. However, her cats continued to show the same problems afterward.

Samon also expressed concern to Saveika over the number of cats she had on file, and he advised her that she should have no more than ten to twelve. Samon explained that he was concerned with the spread of upper respiratory infections (URIs) and giardia, an intestinal parasite, among Saveika's cats. He testified that both conditions can result in severe, even fatal, dehydration. Shortly after Samon told Saveika to keep fewer cats, she ceased bringing her cats to him.

The State also called Carrie Voss, the administrator at the Emancipet clinic who had contacted APD about Saveika's animals. Voss testified that in 2007, the staff at her clinic began to complain about Saveika bringing in so many cats with conditions like dehydration, URIs, and the odor of urine and feces. Technicians told Saveika that an abnormal number of her cats had these conditions and instructed her to increase the cats' access to water. Eventually, the Emancipet staff grew concerned that the cats were not healthy enough for spay or neuter surgery and had to turn many away.

In addition, the jury heard testimony from TLAC veterinarian Rachel Hays regarding the condition of the cats during and after the seizure. Hays attended the seizure with the APD

officers to assess the cats' conditions and to help capture them and transport them to the shelter. Hays testified that she "didn't see any clean water anywhere in the house" and thought the cats were "obviously ill" given their sneezing, nasal discharge, and crusty discharge from their eyes.

After the live cats were transported to TLAC, Hays performed "cage-side exams" of all the cats and more extensive evaluations of some of them. At trial, Hays identified reports from TLAC's computer system reflecting the cats' examination notes and laboratory results. As Hays explained, these reports showed that 57 percent of the cats were dehydrated and 83 percent had some respiratory condition ranging from minor nasal discharge to pneumonia. Hays stressed that both dehydration and respiratory conditions can have serious health consequences and even cause death if untreated.

Further, the reports indicated that 19 percent of the cats were underweight and some had intestinal parasites. Some of the cats had fleas, some had skin conditions like ringworm, and some had areas of skin scalded by urine or diarrhea. Most had feces soiling their coats or under their nails. Hays testified that she believed the conditions in Saveika's home contributed to or caused many of the health problems she observed in the cats. In particular, she estimated that the ammonia in the air was at levels considered a chronic stressor to animals, and she explained that parasitic diseases that "spread through the fecal-oral route" were inevitable for cats stepping in so much feces.

At trial, Saveika testified about her record of rescuing animals and securing them adoptive homes, noting that she devoted a great deal of time, money, and energy to fostering the cats. Saveika also denied providing inadequate care to her cats. She expressed that she believed her cats had a good quality of life, that the majority were healthy, and that all of them "were in better shape

5

than they would be rotting away in a landfill in a plastic bag, which is where Town Lake puts them." However, Saveika admitted that her home was "very dirty" and that she felt "ashamed by how dirty it was."

In addition to having Saveika testify, the defense called Dr. Paul Brandt, a veterinarian who had not seen Saveika's cats in person but examined their records after the seizure. He testified that URIs are extremely common, especially in cats coming from shelters, and that it is impossible to know when a cat was infected with a URI or giardia because the symptoms of both come and go. Brandt also stated that a five-percent dehydration level, as observed in the cats by the TLAC staff, is roughly the lowest possible diagnosis before dehydration is considered undetectable.

Nevertheless, Brandt admitted on cross-examination that stressing conditions such as overcrowding and inadequate water can cause reappearances of both URI and giardia symptoms. Moreover, he said that some cats do die from URIs, just as some humans die of influenza. He stated that five-percent dehydration in a cat, while common, would cause him some concern and agreed that the water in photos of Saveika's home did not look like "a good place for a cat to be drinking." While Brandt stated that the food in some of the photos appeared adequate, he acknowledged that cats should not be living in the conditions shown in the photos. He said he would want a cleaner environment and would advise the owner to find a different home for some of the cats.

The defense also sought to call Dr. John Watterson, a psychologist who began treating Saveika shortly after her arrest. However, Watterson was neither under subpoena nor asked by defense counsel, who expected more than one day of proceedings, to attend the first day of trial. When the trial progressed too quickly to continue into a second day, Watterson could not make it to court in time, and his testimony was not presented.

After the close of evidence, the jury returned a verdict of guilty. Saveika elected to have the trial court set punishment, and the court assessed a sentence of ninety days of confinement, suspended pending eighteen months of community supervision. The terms of Saveika's probation included having no more than three cats in her home, allowing random inspections by police to verify compliance, continuing to receive mental health treatment, and completing forty hours of community service not at an animal shelter or rescue group.

Saveika was subsequently appointed new counsel and moved for a new trial on several grounds, including that she was selectively prosecuted and received ineffective assistance of counsel at trial.[2] After conducting a hearing, the trial court denied the motion for new trial. Saveika now appeals, alleging that (1) her prosecution for animal cruelty was invidiously selective and (2) her trial counsel provided ineffective assistance by failing to raise a selective-prosecution claim, failing to subpoena and call Dr. Watterson, and failing to elicit certain testimony from Dr. Brandt.

**STANDARD OF REVIEW**

Though Saveika does not directly frame her appeal as an appeal from the trial court's denial of her motion for new trial, because the trial court has already denied the merits of her

---

[2] Saveika alleged in her "First Amended Motion for New Trial and First Amended Motion in Arrest of Judgment" that she had been prosecuted both selectively and vindictively. Vindictive prosecution typically involves the State pursuing enhanced charges or an increased sentence after a defendant exercises a right such as to appeal, to collaterally attack her conviction, or to be tried before a jury. *See United States v. Goodwin*, 457 U.S. 368, 373–75 (1982); *Neal v. State*, 150 S.W.3d 169, 173–74 (Tex. Crim. App. 2004). Saveika mentions the legal standard for vindictive prosecution in her brief before this Court, but otherwise makes no argument as to this distinct form of prosecutorial misconduct. Accordingly, we consider this issue to be waived as inadequately briefed. *See* Tex. R. App. P. 38.1(I).

selective-prosecution and ineffective-assistance claims, we must consider her arguments in light of that ruling. Because whether to grant a motion for new trial is within the sound discretion of the trial court, we review the trial court's judgment for abuse of discretion. *See State v. Herndon*, 215 S.W.3d 901, 907 (Tex. Crim. App. 2007).

Under this standard, we do not substitute our judgment for that of the trial court, but rather decide whether its decision was arbitrary and unreasonable. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were so made. *Id.* Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support that ruling. *Id.* Abuse of discretion further serves as a prism through which we view the legal standards relevant to the trial court's bases for denying the motion, in this case the issues of selective prosecution and ineffective assistance of counsel. *See, e.g.*, *Ramirez v. State*, 301 S.W.3d 410, 415 (Tex. App.—Austin 2009, no pet.).

A selective-prosecution claim is not a defense on the merits to a criminal charge, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution. *Roise v. State*, 7 S.W.3d 225, 243 (Tex. App.—Austin 1999, pet. ref'd) (citing *United States v. Armstrong*, 517 U.S. 456, 463 (1996)). Because of a presumption that criminal prosecutions are undertaken in a good-faith, nondiscriminatory fashion, a defendant alleging selective prosecution has the burden of proving "intentional and purposeful discrimination." *Gawlik v. State*, 608 S.W.2d 671, 673 (Tex. Crim. App. 1980) (quoting *United States v. Ojala*, 544 F.2d 940, 943 (8th Cir. 1976)). To establish a prima facie case of selective prosecution, the defendant must provide "exceptionally

8

clear" evidence that the decision to prosecute was made for an improper reason. *Ex parte Quintana*, 346 S.W.3d 681, 685 (Tex. App.—El Paso 2009, pet. ref'd). Once this is made, the burden shifts to the State to justify the discriminatory treatment. *Id.* at 685–86 (citing *Johnson v. California*, 543 U.S. 499, 505 (2005)).

To prevail on a claim of ineffective assistance of counsel, a defendant must show by a preponderance of the evidence that (1) counsel's representation fell below an objective standard of reasonableness under the prevailing professional norms and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). An appellate court must make a "strong presumption that counsel's performance fell within the wide range of reasonably professional assistance." *Robertson*, 187 S.W.3d at 483 (citing *Strickland*, 466 U.S. at 689). To prove prejudice, a defendant must show a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt. *Strickland*, 466 U.S. at 695. A reasonable probability is one sufficient to undermine confidence in the verdict. *Id.* at 687.

The record on direct appeal will only in rare circumstances be adequate to show that counsel's performance fell below an objectively reasonable standard. *See Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005); *see also Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). The record in this case, however, is more developed on direct appeal because of the hearing on the motion for new trial filed by Saveika. Her trial counsel testified in person at the hearing, and Dr. Watterson and Dr. Brandt submitted testimony by affidavit.

## DISCUSSION

**Selective Prosecution**

In her first point of error, Saveika argues that the trial court erred in rejecting her claim that her prosecution for cruelty to animals was invidiously selective. Generally, prosecutors have broad discretion in enforcing criminal laws. *Roise*, 7 S.W.3d at 243. However, that discretion is subject to constitutional constraints. The decision to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (quoting *Oyer v. Boyles*, 368 U.S. 448, 453 (1962)). To establish a prima facie case of selective prosecution, a defendant must provide "exceptionally clear evidence" that the decision to prosecute was for an improper reason. *Id.* This requires a showing that (1) the government has singled her out for prosecution even though the government has not proceeded against others similarly situated, and (2) the government's discriminatory selection is invidious, meaning it is based on impermissible considerations such as race, religion, or the exercise of a constitutional right. *Gawlik*, 608 S.W.2d at 673. Together, these two elements are commonly referred to as "intentional and purposeful discrimination." *Id.* (quoting *Ojala*, 544 F.2d at 943).

In support of her selective-prosecution claim, Saveika asserts that she is an outspoken critic of TLAC and has been penalized for that fact by the State. Saveika argues that she has established a prima facie case that she was singled out for prosecution based on her criticism of TLAC and that the burden therefore shifted to the State to justify its discriminatory treatment, which it failed to do. The State responds that Saveika's claim is unpreserved because it was not timely and that the evidence she presents does not establish a prima facie case for selective prosecution.

10

We first consider the State's contention that Saveika failed to preserve error on her selective-prosecution claim. The State asserts that if Saveika had indeed been prosecuted for her criticism of TLAC, she would have known it before trial began. Under Texas Rule of Appellate Procedure 33.1, "[a] party's complaint is regarded as timely when it was made 'as soon as the ground for complaint is apparent or should be apparent.'" *Lovill v. State*, 319 S.W.3d 687, 692 (Tex. Crim. App. 2009) (quoting *Aguilar v. State*, 26 S.W.3d 901, 906 (Tex. Crim. App. 2000)). Accordingly, the State argues, the selective-prosecution claim raised in Saveika's motion for new trial was untimely.

The Texas Court of Criminal Appeals has indicated that a selective-prosecution claim must be raised at or before trial. *Id.* ("Consistent with our preservation jurisprudence, in *Gawlik v. State*, we held that Gawlik did not preserve his selective prosecution complaint for appellate review because he failed to object on this basis at trial.") (citing *Gawlik*, 608 S.W.2d at 673). Moreover, we agree with the State that Saveika did not complain of selective prosecution as soon as her ground for complaint was apparent or should have been apparent. At the new-trial hearing, Saveika's trial counsel testified that Saveika had informed him of her suspicions of selective prosecution well before trial; however, he concluded that the claim would be too difficult to prove and therefore did not pursue it further. Because the record demonstrates that Saveika's claim was apparent at or before trial, her complaint is untimely and therefore unpreserved for our review.

Nevertheless, even if Saveika's claim were timely, we would overrule it on appeal because of Saveika's failure to establish a prima facie case—i.e., to show by exceptionally clear evidence that "intentional and purposeful discrimination" occurred. The first prong of a prima facie case of selective prosecution requires Saveika to show "that, while others similarly situated have not

11

generally been proceeded against because of conduct of the type forming the basis of the charge against [her], [she] has been singled out for prosecution." *Gawlik*, 608 S.W.2d at 673 (quoting *Ojala*, 544 F.2d at 943). At the hearing on her motion for new trial, Saveika presented evidence that of approximately 156 individuals charged with misdemeanor animal cruelty between January 2006 and September 2010, 79 received "special treatment" from prosecutors.[3] Saveika argues that this historical data adequately established a prima facie showing of selective prosecution. We disagree. Since this data only represents individuals who were in fact charged by the State with animal cruelty, it does not constitute evidence that others similarly situated were not "proceeded against." Further, in this case, a ratio of 79 out of 156—or slightly more than half—does not provide "exceptionally clear evidence" that Saveika was "singled out" by the State. *Cf. Ojala*, 544 F.2d at 943 (tax delinquency defendant made "strong showing" of first element of selective prosecution by presenting evidence that out of 51,000 tax delinquency investigations in his state in two years, of which 4,000 were brought to attention of IRS Intelligence Division, only nine failure to file cases were brought). Accordingly, Saveika failed to establish the first requirement of selective prosecution.

As to the second prong of selective prosecution, Saveika must demonstrate that her prosecution was based on impermissible considerations. Specifically, Saveika alleges that as an outspoken critic of TLAC, she was impermissibly targeted due to her exercise of her First Amendment free speech rights. The State argues that Saveika has failed to establish this because

---

[3] The dispositions that Saveika characterizes as "special treatment" include dismissals for deferred prosecution agreements; failures by the prosecution to take action to bring cases to court for two or more years; and felony charges that, after a grand jury returned a no bill, were reduced first to Class A and then to Class C misdemeanor charges.

12

she presented no evidence at the hearing on her motion for new trial that she was an outspoken critic of TLAC, much less that the county attorney knew about it and prosecuted her for that reason. We agree that Saveika failed to establish these and other facts pertinent to the second prong of a selective-prosecution claim.

Saveika's assertions are inadequate for three reasons. First, while it is impermissible for the State to prosecute selectively based on the exercise of First Amendment rights, there is little evidence that Saveika exercised such rights in this case. *See Galvan v. State*, 988 S.W.2d 291, 295–96 (Tex. App.—Texarkana 1999, pet. ref'd). A prima facie case of selective prosecution requires evidence that the defendant possesses the trait on which basis the State allegedly discriminated. *See id.* (holding that defendant's argument that prosecution targeted Hispanics failed because he provided no evidence that he was Hispanic). The only evidence that Saveika was an outspoken critic of TLAC was her trial attorney's testimony that she told him she was. Saveika provided the trial court with no direct evidence, whether through e-mail printouts, newspaper clippings, or even a sworn affidavit, that she ever spoke out in criticism of TLAC. If anything, the evidence presented at trial indicates that Saveika cooperated with TLAC. The shelter repeatedly contacted her about taking in animals at risk of being euthanized, and she frequently agreed. Saveika thus failed to present "exceptionally clear" evidence that she in fact possessed the trait on which her selective-prosecution claim is based. *See id.*

Second, even if Saveika had proven that she was an outspoken critic of TLAC, she would also have needed to make a threshold showing that others who did not criticize TLAC could have been prosecuted but were not. *See Armstrong*, 517 U.S. at 458; *Carreras v. State*, 936 S.W.2d 727, 730 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd), *cert. denied*, 522 U.S. 933 (1997)

13

(defendant "'failed to identify any individuals who were not' females, 'could have been prosecuted for the offenses for which' appellant was 'charged, but were not so prosecuted.'" (citation omitted)). Saveika provided the trial court with no evidence that the 79 animal-cruelty defendants who received "special treatment" were not also outspoken critics themselves.

Third, to prove that her prosecution was based on impermissible considerations of her criticism of TLAC, Saveika would necessarily have to show that the State was aware of that alleged criticism at the time the decision was made to prosecute Saveika. *See Green v. State*, 934 S.W.2d 92, 103 (Tex. Crim. App. 1996) ("[A]n appellant must provide 'exceptionally clear evidence' that the decision to prosecute was for an improper reason."). Saveika presented no evidence from which the trial court could have reasonably concluded that prosecutors knew of her criticism of the shelter. Without such evidence, no causal connection can be made between Saveika's free speech and her prosecution, and the strong presumption of good-faith, nondiscriminatory prosecution cannot be overcome in this case. In conclusion, Saveika has failed to establish a prima facie showing of discriminatory intent in the State's prosecution of her.[4]

---

[4] Saveika claims that she could have provided evidence of the prosecutors' invidious motives if the trial court had allowed her to subpoena documents and testimony from the county attorney. However, Saveika does not claim on appeal that the trial court erred in granting the State's motion to quash the subpoena for these documents and testimony. *See* Tex. R. App. P. 33.1 (discussing preservation of appellate complaints). In fact, at the hearing on the motion for new trial, Saveika's counsel conceded that the State's objections to the subpoena were probably sound and merely complained that the State should have cooperated nonetheless. Further, Saveika makes no assertion of what facts in support of her claim the documents and testimony would have revealed. Since the justifications for a rigorous standard for the elements of a selective-prosecution claim require a correspondingly rigorous standard for discovery in aid of such a claim, it is unclear how Saveika could have prevailed even if she had formally challenged the trial court's ruling on the motion to quash. *See United States v. Armstrong*, 517 U.S. 456, 468 (1996).

14

In sum, Saveika has failed to establish a prima facie case of selective prosecution. Accordingly, we cannot conclude that the trial court abused its discretion in denying Saveika's motion for new trial on this basis. Her first point of error is overruled.

**Ineffective Assistance of Counsel**

In her second point of error, Saveika argues that she received ineffective assistance of counsel at trial. Such a claim requires proof by a preponderance of the evidence that (1) counsel's representation fell below an objective standard of reasonableness under the prevailing professional norms, and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) (citing *Strickland*, 466 U.S. at 697).

In assessing an ineffective-assistance claim, we must make a "strong presumption that counsel's performance fell within the wide range of reasonably professional assistance." *Robertson*, 187 S.W.3d at 483. Counsel's deficiency must be affirmatively demonstrated in the trial record; the appellate court must not engage in retroactive speculation. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). When direct evidence of ineffectiveness is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined. Garcia, 57 S.W.3d at 440. Further, to prove prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Rather, a defendant must show that there is a reasonable probability, meaning a probability

sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different but for the unprofessional errors of counsel. *Id.* at 687.

In the present case, Saveika first claims that her attorney's failure to investigate and present a timely claim of selective prosecution represented ineffective assistance. However, we have already determined that Saveika's selective-prosecution claim, even if timely, lacks merit. A claim of ineffective assistance of counsel requires proof of prejudice, yet Saveika does not show a reasonable probability that her claim would have succeeded on the merits if counsel had presented it earlier. Accordingly, we proceed to consider the other grounds on which Saveika alleges ineffective assistance.

Saveika next cites as ineffective her attorney's failure to present "the most important parts" of the available expert testimony of Dr. Paul Brandt. In an affidavit admitted in support of Saveika's motion for new trial, Brandt states that he was prepared to testify at trial that the cats were not suffering from malnutrition and thus "were likely eating well enough." According to Saveika, counsel's failure to present this testimony at trial was "not based upon any trial strategy" and also "seriously prejudiced the defense" because the testimony "would have negated the allegedly criminal result of the relevant conduct at question in the case, thus rebutting the offense in its entirety." The State counters that neither of these assertions is valid because malnutrition was not the issue on which the prosecution focused at trial.

For the reasons that follow, we agree that any failure by Saveika's trial counsel to ask Dr. Brandt about the cats' nutrition does not constitute ineffective assistance. First, the trial court could have reasonably concluded that Saveika's trial counsel strategically focused on the State's

16

main theories of the case, which Brandt's testimony regarding malnutrition would not have addressed. Saveika was charged with an offense defined as "fail[ing] unreasonably to provide necessary food, water, care, *or* shelter," not all of the above. Tex. Penal Code Ann. § 42.092(b)(3) (emphasis added). Hence, prosecutors were not required to prove that the cats were malnourished in addition to having inadequate water and care, and a review of the record shows that they did not pursue that theory at trial. Instead, the prosecution witnesses emphasized the poor air quality, lack of water, and rapid spread of disease due to the crowded conditions in Saveika's home. Very few questions concerned malnutrition or inadequate feeding of the cats. Because the prosecution focused on the issues of air quality, hydration, and disease, the trial court could reasonably have imagined that trial counsel had a sound strategic motivation to focus on those same issues. *See Garcia*, 57 S.W.3d at 440 ("[I]n the absence of evidence of counsel's reasons for the challenged conduct, an appellate court 'commonly will assume a strategic motivation if any can possibly be imagined.'" (citation omitted)).

Second, the additional testimony from Brandt would have been cumulative of other evidence presented at trial showing that the cats had adequate nutrition. When a detective who was present at the seizure was asked about the food and water in Saveika's home, he answered, "I believe there was adequate food." Later, while cross-examining Dr. Brandt, the prosecution showed him photos of Saveika's home and asked about the food in one picture. Brandt replied, "Looks adequate." Because the jury heard some testimony characterizing the cats' food as adequate, the trial court could have reasonably decided that the omission of further such testimony was not prejudicial. *See Strickland*, 466 U.S. at 687. Accordingly, viewing the evidence in the light most favorable to

17

the trial court's judgment, we cannot say it was unreasonable to conclude that Saveika received effective assistance in this matter.

Lastly, Saveika argues that counsel was ineffective in his failure to subpoena Dr. Watterson for testimony as to her mental state.[5] According to Watterson's affidavit made part of the record on the motion for new trial, he was prepared to testify that he began treating Saveika shortly after her arrest for severe bipolar disorder that rendered it impossible for her "to recognize or comprehend the reality of the poor state of the circumstances in her home." As a result, according to Watterson, Saveika "did not have moments of conscious disregard of the reality of those circumstances." Saveika claims that the omission of this testimony was "not based upon any trial strategy" because it resulted from a counsel's failure to subpoena Watterson, meaning he could not be compelled to come to court on the only day of trial. Saveika also claims that this testimony would have "negated the culpable mental state required to prove the offense" of cruelty to animals, and the failure to present it therefore "seriously prejudiced the defense, resulting in a verdict that is unreliable."

The State responds that the decision not to subpoena Watterson was in fact motivated by a sound trial strategy not to antagonize Watterson by disrupting his clinical practice, as counsel testified at the hearing on the motion for new trial. The State also alleges that counsel's failure to call Watterson was not prejudicial because, having treated Saveika only since she was arrested, Watterson could not speak to her mental state at the time of her offense. His testimony would therefore have been inadmissible as irrelevant.

---

[5] Saveika also asserts, only in the portion of her brief entitled "Factual Summary," that her attorney provided ineffective assistance by failing to inform her of a plea bargain offer and failing to secure the admission of certain photographs, periodical material, and government records into evidence. As these claims are not mentioned again, we consider them waived as inadequately briefed. *See* Tex. R. App. P. 38.1(I).

We agree that Saveika has failed to demonstrate ineffective assistance in this aspect of her trial counsel's performance. At the new-trial hearing, trial counsel testified that he believed the trial would continue for more than one day and that no subpoena was necessary because Watterson had agreed to testify. Furthermore, although he testified that he had not thought Watterson would lie or become hostile on the stand if subjected to a subpoena, he stated that his priority had been to "keep Watterson happy." The trial court could infer from counsel's testimony that he feared Watterson would not give the most expressive or compelling testimony in defense of Saveika if he was annoyed by a disruption in his practice. *See Robertson*, 187 S.W.3d at 483 (noting the "strong presumption that counsel's performance falls within the wide range of reasonable professional assistance"). Given this evidence, the trial court could have reasonably determined that counsel's performance did not fall below an objective standard of reasonableness under the prevailing professional norms. *See Strickland*, 466 U.S. at 687. The court could reasonably conclude, then, that the strong presumption of adequate assistance was not overcome. *See Robertson*, 187 S.W.3d at 483.

In addition, Saveika has not demonstrated that the failure to present Watterson's testimony was prejudicial. In other words, she does not establish a "reasonable probability" that if Watterson had testified, "the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. Watterson's proposed testimony, which concerns his treatment of Saveika's mental illness subsequent to her arrest, does not directly address Saveika's mental state at the time she allegedly committed cruelty to animals. Indeed, trial counsel expressly admitted at the new-trial hearing that Watterson would not have been a fact witness regarding Saveika's mental state at the time of her alleged offense, but would have led the jury to view Saveika

19

more sympathetically. As a consequence, we cannot say that the testimony would have created a reasonable doubt respecting Saveika's guilt.

Watterson's testimony would also have been contradicted by other testimony at trial. For instance, Saveika explicitly admitted that she was ashamed of the state of her home, suggesting she had some awareness of the conditions. Meanwhile, the State presented testimony from Dr. Samon and other witnesses that Saveika was informed that her behavior posed serious health risks to her animals. The evidence also suggested that she stopped seeing Samon after he discovered the number of cats she possessed, indicating she understood her conduct to be objectionable. Based on this evidence, together with the slight probative value of Watterson's testimony, there is not a reasonable probability of a different outcome had Watterson testified. *See Strickland*, 466 U.S. at 694. Because we must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were so made, we cannot say that the trial court was arbitrary or unreasonable in denying Saveika's motion for new trial on this ground. *See Charles*, 146 S.W.3d at 208.[6]

Saveika has not met her burden of proving both deficient and prejudicial representation in any aspect of her counsel's performance at trial. We hold that the trial court did

---

[6] The State also argues that counsel's failure to call Watterson was not prejudicial because his testimony would only have advanced a "diminished capacity" defense, which Texas does not recognize. However, we do not understand the proposed testimony to suggest that Saveika "is absolutely incapable of ever forming that frame of mind" required to commit animal cruelty. *See Jackson v. State*, 160 S.W.3d 568, 575 (Tex. Crim. App. 2005). Rather, it seems intended for the permissible purpose of supplying "relevant evidence . . . which the jury may consider to negate the *mens rea* element. And, this evidence may sometimes include evidence of a defendant's history of mental illness." *Id.* at 574. Regardless, because we hold for other reasons that the testimony's omission was not prejudicial, this issue is not dispositive.

not abuse its discretion in denying Saveika's motion for new trial on the basis of ineffective assistance of counsel. Her second point of error is overruled.

## CONCLUSION

Because the trial court did not err in denying Saveika's motion for new trial on grounds of selective prosecution and ineffective assistance of counsel, we affirm the judgment.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed:   June 8, 2012

Do Not Publish