

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00813-CR

Tracy Devon **BROWN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 144th Judicial District Court, Bexar County, Texas
Trial Court No. 2009-CR-5633
The Honorable Angus McGinty, Judge Presiding[1]

Opinion by:    Rebeca C. Martinez, Justice

Sitting:    Marialyn Barnard, Justice
Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  July 30, 2014

AFFIRMED

Tracy Brown appeals her murder conviction, asserting the trial court erroneously excluded

expert testimony about her mental condition at the time of the offense and erroneously denied her

request for lesser-included offense instructions on manslaughter and deadly conduct.  We overrule

Brown's issues and affirm the trial court's judgment.

---

[1] The Honorable Sharon MacRae, former presiding judge of the 290th Judicial District Court, Bexar County, Texas, conducted the trial in this matter in August 2010.  The Honorable Angus McGinty, former presiding judge of the 144th Judicial District Court, Bexar County, Texas conducted the new punishment hearing and signed the final judgment on November 16, 2012.

## FACTUAL AND PROCEDURAL BACKGROUND

Brown is the ex-wife of the deceased, Victor Brown. On the evening of March 8, 2009, Tiffany Ellis, an Army medic, was at Victor's house helping him install a ceiling fan. When the doorbell rang, Victor looked out the upstairs window and stated, "It's my ex-wife." After Victor went downstairs, Ellis heard a loud noise and Victor said, "Tiffany[,] she shot me." Ellis went downstairs and found Victor lying face down. Ellis called 911 and then provided assistance to Victor. When Bexar County Sherriff's deputies arrived, they observed that the window of the front door was shattered; they found one shell casing outside the front door and another shell casing just inside the front door. They also found a knife and shotgun shell wadding and holes in the rear walls.

Deputies spoke to two of Victor's neighbors. Olga Garza had just arrived home from Wal-Mart with her daughters when she heard a gunshot and ran toward her house. As Garza was opening the front door, she heard another gunshot. When she looked toward the front door of Victor's house, she saw smoke. Garza noticed that a car was parked next door at Victor's house, but when she looked again after the gunshots the car was gone. Another neighbor, Brandon Abernathy, heard a loud bang and walked outside his front door. He saw a woman walking away from a house on Highland Lake, Victor's street. The woman was carrying a long rod covered with a blanket. After she put the bundle inside her car, she walked back toward the house. A few moments later, he saw her walk back to her car and speed off.

At approximately 4:00 a.m., Brown called the Dallas Police Department, stating that she wanted to turn herself in. Brown stated, "I just killed my boss three and a half hours ago." She also stated the killing happened in San Antonio. A Dallas police officer made contact with Brown at a gas station. Brown was in a vehicle with her three children. Brown was in such an emotional

state that the officer called an ambulance. One of the children told the officer that Brown had taken multiple prescription pills.

Officers searching Brown's home found a shotgun, a box of ammunition, two earmuffs of the type worn when firing a weapon, a tissue with apparent blood on it, a Spiderman blanket, and a soft gun case. A search of Brown's vehicle revealed two suitcases in the trunk; a spent shotgun shell was found inside one of the suitcases. The Spiderman blanket tested positive for gunshot residue and also contained glass fragments. The knife recovered from Victor's house tested positive for wood fragments. A firearms expert testified that the shotgun shell found inside Brown's suitcase had been fired by the shotgun found in her home. The autopsy conducted on Victor showed two gunshot wounds – one traveling from front to back of the body and the other traveling from back to front. His cause of death was shotgun wounds to the chest and back. The first gunshot wound to the chest would have been fatal by itself. Wood fragments were also found on Victor's body, indicating that an object was between Victor and the firearm when it was fired.

Brown was charged with Victor's murder. Paragraph A of the indictment alleged that Brown intentionally and knowingly caused the death of Victor Brown by shooting him with a deadly weapon, namely a firearm. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). Paragraph B alleged that, with intent to cause serious bodily injury to Victor, Brown committed an act clearly dangerous to human life that caused Victor's death by shooting him with a deadly weapon, namely a firearm. *Id.* § 19.02(b)(2) (West 2011).

At trial, in addition to the evidence detailed above, Brown's 14-year old daughter, Alexis Heard, testified. Alexis stated that her mother was a nurse practitioner, and she could prescribe medication. Alexis testified that Victor was her stepfather for many years, but he and her mother got divorced when she was 12 years old. Alexis stated that she was always frightened of Victor because she saw him hitting and choking her mother on several occasions. Victor also beat Alexis

with belts, causing marks that she still has on her body. The police were called out several times, but they did not do anything. Alexis testified her mother bought a shotgun when they moved into their own house; her mother kept the gun in her closet and would go practice shooting. Alexis also explained that she (Alexis) was afraid Victor would come break in their house, so she sometimes slept with a knife under her pillow.

On the day that Victor was killed, Alexis stated her mother "seemed really scared." Brown closed all the windows, locked all the doors, and kept Alexis and her two brothers inside the house all day, forbidding anyone to look out the windows. Alexis stated that her mother had started acting really scared about one week before. That night, Alexis and her brothers slept in Brown's bedroom because they were so scared. During the night, Brown woke up Alexis and her two brothers; they quickly packed some clothes, got in the car, and drove to Dallas. Alexis remembered hearing a bullet being popped out of the shotgun shortly after her mother woke them up. While they were in the car, Brown told Alexis that she had gone to Victor's house and shot him. As they were driving, Brown called Alexis's grandmother and discussed an account with money in it; Brown also called a man she was friends with and tried to arrange for him to take the children to their grandmother's house. When they stopped, Alexis saw her mother take some prescription pills. Alexis identified the gun recovered by police as her mother's gun and identified the Spiderman blanket as her brother's blanket.

Finally, defense counsel sought to introduce expert testimony by Dr. Bryan Skop, a psychiatrist, about Brown's mental condition on the night of the murder pursuant to Code of Criminal Procedure article 38.36(a). TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (West 2005). The State objected that such testimony was irrelevant during the guilt/innocence phase. At a hearing outside the jury's presence, Dr. Skop testified that based on his three interviews with Brown during

2009,[2] his opinion was that Brown was not legally insane but had "major depressive disorder, reoccurrence severe episode, post-traumatic stress disorder, and dependent personality disorder" on March 8, 2009 when Victor was murdered. Dr. Skop stated that homicidal and suicidal thoughts can arise during a major depression, and that he believed Brown was experiencing those particular symptoms at the time of the murder. When asked how his diagnosis would affect Brown's mental ability to "intentionally" or "knowingly" commit an act, under those terms' legal definitions, Dr. Skop stated the following:

> I think there's a few things that I would think about from that respective [sic]. One is that she was having intrusive thoughts of killing herself, killing her ex-husband and killing her children at the time period, and leading up to the incident. And she was also having some paranoia. She was having some disassociation. Meaning she was somewhat disconnected, like observing her actions which is part of post-traumatic stress disorder. And so that's . . . that's where I would think about it affecting the intent.
>
> Knowingly, I . . . I don't . . . it's hard for me to comment that her mental illness would necessarily, too much affect knowingly given the evidence in the case in that whether she knew what she was doing or not except that she was somewhat disassociated from the experience, and it was sort of observing herself rather than living in the moment.

When asked what effect Brown's paranoia would have with regard to "knowingly," Dr. Skop stated that he did not believe she had a paranoid delusion per se. However, he explained that Brown was experiencing paranoia that Victor was going to cause her physical or mental harm, and this would affect her belief that she needed to protect herself and her children.

On cross-examination, Dr. Skop agreed that at the time of the murder Brown had the requisite mental state to form the intent to buy a gun, to drive to a specific location, and to fire the gun at someone, all of which she did. With respect to a "knowing" mental state, Dr. Skop agreed that Brown would have known that if she pulled the trigger while pointing a loaded gun at

---

[2] Dr. Skop's first interview with Brown occurred on May 7, 2009, two months after Victor's murder.

someone, "it's very likely going to kill them." Dr. Skop clarified that Brown's disassociation "is more sort of an observance of what's going on" and would pertain more to intent than knowing.

At the conclusion of the hearing, the trial court indicated it was not convinced that Brown's mental illnesses impacted her ability to form an intent or to knowingly engage in conduct, but stated it would take the matter under advisement. The court ultimately ruled that Dr. Skop's testimony[3] was not admissible during the guilt/innocence phase because it did not directly negate the culpable mental state for the offense as required by the applicable caselaw. The court noted that the pertinent issue was Brown's state of mind during the commission of the offense and stated that Dr. Skop's testimony was not relevant on that issue. Dr. Skop was permitted to testify about Brown's mental illnesses during the punishment phase.

The jury found Brown guilty of murder, but was unable to reach an agreement on punishment and a mistrial was granted. Brown was subsequently sentenced to 40 years' imprisonment upon the recommendation of a second jury after a new punishment hearing. Brown now appeals.

## EXCLUSION OF EXPERT TESTIMONY

In three issues, Brown asserts the trial court erred in excluding Dr. Skop's testimony about the mental illnesses she was suffering at the time of Victor's murder, thereby violating her due process right to present a defense. *See* U.S. CONST., amend. VI, XIV; TEX. CONST., art. I, § 10. Brown argues that Dr. Skop's testimony was admissible during the guilt/innocence phase because it showed the impaired condition of her mind at the time of the offense and tended to negate the *mens rea*, or culpable mental state, of "intentionally or knowingly" required to commit murder as charged in the indictment. *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a) ("[i]n all prosecutions

---

[3] Brown also sought to introduce the testimony of another medical expert, Dr. Sellers, during the guilt/innocence phase. However, Brown does not raise the exclusion of Dr. Sellers' testimony as an issue on appeal.

for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship . . . together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."). We review a trial court's ruling admitting or excluding evidence of a defendant's mental illness for an abuse of discretion. *Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005); *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990).

Brown argues that Dr. Skop's testimony about her mental illnesses directly negated the required *mens rea* for murder, and was thus admissible under article 38.36(a) and *Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2008). In *Ruffin*, the trial court excluded a psychologist's testimony that at the time of the aggravated assault against police officers the defendant, although not insane, had become psychotic and was suffering deep depression, delusions, paranoia, and irrationality and, therefore, had diminished capacity to make rational decisions. *Id.* at 590. The court of appeals affirmed, holding that such expert testimony is only admissible in murder prosecutions or if a defendant pleads insanity. *Id.* at 591. The Court of Criminal Appeals reversed, reaffirming its decision in *Jackson* and holding that both lay and expert testimony of mental disease or defects that "directly rebuts" the particular *mens rea* necessary for the charged offense is relevant and admissible, unless it is excluded under a specific evidentiary rule. *Id.* at 596; *see Jackson*, 160 S.W.3d at 574. The Court acknowledged that Texas law presumes that a criminal defendant is sane and intends the natural consequences of his acts and only excuses a defendant from criminal responsibility if he proves the affirmative defense of insanity. *Ruffin*, 270 S.W.3d at 591-92. The Court confirmed that Texas does not recognize diminished capacity as an affirmative defense. *Id.* at 593 (the Texas legislature has not enacted any affirmative defenses, other than insanity, based on mental disease, defect, or abnormality); *Jackson*, 160 S.W.3d at 573 (same). However, as with other elements of an offense, relevant evidence may be presented that

negates any *mens rea* elements. *Ruffin*, 270 S.W.3d at 593-94; *Jackson*, 160 S.W.3d at 574. This evidence may include a defendant's physical or mental diseases or defects, including a history of mental illness. *Ruffin*, 270 S.W.3d at 593-94; *Jackson*, 160 S.W.3d at 574. The evidence must still, however, meet the general requirements for admission of evidence such as Rules of Evidence 402, 403, and 701-705. *Ruffin*, 270 S.W.3d at 593-94; *Jackson*, 160 S.W.3d at 574. Further, the evidence may be excluded if it does not truly negate the *mens rea*. *Ruffin*, 270 S.W.3d at 596.

Brown argues Dr. Skop's testimony showed that, even though she was not insane, she was not able to form the necessary intent or to control her actions due to her mental illnesses; therefore, the expert testimony directly rebutted the required culpable mental state for murder and was admissible. We disagree. The proffer of Dr. Skop's testimony[4] did not directly negate the *mens rea* element required to convict Brown of murder. Dr. Skop did not state that, due to her mental diseases, Brown was incapable of forming the intent to kill Victor or incapable of acting with knowledge of her conduct and its consequences. The most affirmative statement by Dr. Skop that could be used to challenge *mens rea* was that Brown's disassociation manifested in her being "somewhat disconnected, like observing her actions" and "that's where I would *think* about it affecting the intent." (emphasis added). Dr. Skop did not state that any of Brown's mental conditions negated her ability to form an intent. To the contrary, Dr. Skop conceded that Brown had the mental capacity to form the intent to buy a gun, drive to Victor's house, and fire the gun at him. *See Ex parte Thompson*, 179 S.W.3d 549, 556 n. 18 (Tex. Crim. App. 2005) ("It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, and that the act of pointing a loaded gun at someone and shooting it

---

[4] Brown not only cites to the proffer of Dr. Skop's testimony, but also cites his actual testimony admitted during the punishment phase. The punishment evidence was not before the trial court at the time of its challenged ruling, and therefore we do not consider it in our analysis.

toward that person at close range demonstrates an intent to kill.") (internal citations omitted). As to Brown's ability to act knowingly, Dr. Skop stated that even with her mental conditions Brown would have known that the action of pulling the trigger of a loaded gun while pointing it at a person will likely result in killing them. Further, unlike in *Ruffin*, Dr. Skop stated that he did not believe Brown had suffered a paranoid delusion "per se." *Cf. Ruffin*, 270 S.W.3d at 596-97 (expert evidence explaining "when and how paranoid delusions may distort a person's auditory and visual perceptions is admissible as it relates to whether appellant intended to shoot at police officers," rather than at "Muslims or some other figment of his mind").

We conclude the trial court did not abuse its discretion in excluding Dr. Skop's proffered testimony during guilt/innocence because it did not truly negate the required *mens rea*. *See id.* at 596. Therefore, Brown's constitutional right to present a defense was also not infringed.[5]

## LESSER-INCLUDED OFFENSE INSTRUCTIONS

In her fourth issue, Brown asserts the trial court should have granted her request for lesser-included offense instructions on manslaughter and deadly conduct. We apply the two-prong *Aguilar/Rousseau* test to determine whether an instruction on a lesser-included offense should have been included in the jury charge. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). The court first determines the question of law whether the proof necessary to establish the charged offense also includes the lesser offense. *Id.* (first prong of test involves comparing

---

[5] Brown also argues that Dr. Skop's testimony was admissible under Code of Criminal Procedure article 38.36(b) because it showed the impact of the previous abusive relationship on Brown's mental state at the time of the murder. *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(b) (West 2005) (permitting a murder defendant who raises a justification defense, i.e., self-defense, deadly force in defense of a person, or defense of a third person, to offer relevant evidence that she was the victim of family violence and to offer expert testimony regarding the condition of her mind at the time of the offense, including relevant facts and circumstances relating to family violence that are the basis of the expert's opinion). However, the record shows that Brown relied solely on subsection (a) of article 38.36 in the trial court, and never argued that Dr. Skop's testimony was admissible under subsection (b); therefore, this argument was not preserved. *See* TEX. R. APP. P. 33.1(a).

elements of the greater offense as alleged in the indictment with the elements of the lesser offense to determine whether lesser offense is a "lesser-included" of the greater offense). If that prong is established, the court then evaluates whether the trial evidence shows that, if the appellant is guilty, she is guilty only of the lesser offense. *Id.* A defendant is entitled to a lesser-included offense instruction if "some evidence from any source raises a fact issue on whether he is guilty of only the lesser, regardless of whether the evidence is weak, impeached, or contradicted." *Id.* at 383. There are two ways in which evidence may indicate that a defendant is guilty of only the lesser offense—if evidence exists that "refutes or negates other evidence establishing the greater offense," or if "the evidence presented regarding the defendant's awareness of the risk may be subject to two different interpretations, in which case the jury should be instructed on both inferences." *Id.* at 385.

As noted, the indictment alleged two alternative means of committing murder, alleging that Brown intentionally or knowingly caused Victor's death, and that she intended to cause Victor serious bodily injury and committed an act clearly dangerous to human life that caused his death. TEX. PENAL CODE ANN. § 19.02(b)(1), (2); *see id.* § 6.03(a), (b) (West 2011) (defining the culpable mental states of "intentionally" and "knowingly"). A person commits manslaughter if she recklessly causes the death of a person. *Id.* § 19.04 (West 2011). A person engages in deadly conduct if she recklessly engages in conduct that places another in imminent danger of serious bodily injury, including by knowingly discharging a firearm at or in the direction of an individual. *Id.* § 22.05 (West 2011). The culpable mental state of recklessness is common to both offenses. A person acts "recklessly" with respect to the circumstances surrounding her conduct or the result of her conduct means the defendant is "aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c) (West 2011).

The State concedes the first prong of the *Aguilar/Rousseau* test is met because both manslaughter and deadly conduct constitute lesser-included offenses of murder as it was pled in the indictment. *See Cavazos*, 382 S.W.3d at 384 (manslaughter as lesser-included of murder); *see also Barrios v. State*, 389 S.W.3d 382, 399 (Tex. App.—Texarkana 2012, pet. ref'd) (deadly conduct as lesser-included of murder). The State asserts, however, that there is no evidence to support a finding that Brown did not intentionally and knowingly cause Victor's death, and was only guilty of one of the lesser offenses. *Cavazos*, 382 S.W.3d at 382. We agree. As detailed *supra*, the record contains substantial evidence showing that Brown engaged in a series of intentional and knowing acts that caused Victor's death: she drove approximately 30 miles to Victor's house with a knife and shotgun; rang the doorbell so Victor would come to the front door; fired once through the front door window resulting in a gunshot wound to Victor's chest; fired a second time resulting in a gunshot wound to his back; and Victor died from the gunshot wounds. The specific intent to kill may be inferred from the use of a deadly weapon. *Cavazos*, 382 S.W.3d at 384; *Godsey v. State*, 719 S.W.2d 578, 580-81 (Tex. Crim. App. 1986) (if deadly weapon was used in a deadly manner, the inference is almost conclusive that defendant intended to kill). Brown then fled the scene and returned home where she woke up her children, packed two suitcases, and drove several hours north to Dallas. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (flight is evidence of consciousness of guilt); *Hardesty v. State*, 656 S.W.2d 73, 78 (Tex. Crim. App. 1983) (same). Further, Brown admitted to her daughter and the Dallas police officer that she "shot Victor" and "killed 'her boss' in San Antonio," thus indicating her knowledge of her actions and their result. *See Cavazos*, 382 S.W.3d at 384 (noting that "[a]lthough the only mens rea specified in Section 19.02(b)(2) is the intent to cause serious bodily injury . . ., murder under Section 19.02(b)(2) is a 'result' crime . . .").

Brown relies heavily on a single statement by the medical examiner that she argues constitutes "some evidence" that her action in shooting through the front door was merely reckless. In response to a question asking whether shooting a person is an act clearly dangerous to human life, the medical examiner stated, "Yes, it is considered to be an act with reckless endangerment, so to speak, of someone's life or disregard for someone's life." The witness was answering an abstract question, and did not state that Brown *only* committed an act of reckless endangerment. Moreover, the single statement is cited in isolation and out of the context of the rest of the medical examiner's testimony and the record as a whole. *See Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000) (in analyzing second prong of lesser-included offense test, appellate court must examine the entire record "instead of plucking certain evidence from the record and examining it in a vacuum"). Brown also points to the fact that she shot through the front door as some evidence suggesting that her actions were merely "reckless in firing in the direction of" the door. However, the record shows Brown did not merely shoot "in the direction of" the front door; she purposely rang the doorbell to lure Victor to the front door, fired twice at close range through the door from the front porch, where two spent shell casings were found.

Finally, Brown cites to the expert testimony concerning her mental illnesses that was admitted during punishment. Again, that punishment evidence was not before the trial court at the time Brown requested the lesser-included offense instructions be added to the court's charge on guilt/innocence. Moreover, as in *Jackson*, the evidence of her depression, post-traumatic stress disorder, and paranoia does not negate the culpable mental state required for murder, but rather provides a motive for the intentional act and an excuse for the crime. *See Jackson*, 160 S.W.3d at 572 (evidence of defendant's paranoia and other mental illness did not negate the *mens rea* for murder, but rather made it "even more apparent that Appellant intended to cause serious bodily

injury or death to his brother" because he was so paranoid he believed his brother was "out to get him").

We conclude the record contains no evidence that Brown was only guilty of either lesser-included offense, and was not guilty of murder. *See Cavazos*, 382 S.W.3d at 385 (there must be some affirmative evidence that is "directly germane" to the lesser-included offense which rises to a level that a rational jury could find that the defendant is guilty only of the lesser offense). The trial court therefore did not err in denying Brown's request for the lesser-included offense instructions.

Based on the foregoing reasons, we overrule Brown's issues on appeal and affirm the trial court's judgment.

Rebeca C. Martinez, Justice

DO NOT PUBLISH