

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00212-CR

TOMMY GEORGE DOOLEY                                    APPELLANT

V.

THE STATE OF TEXAS                                         STATE

----------

### FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
### TRIAL COURT NO. CR13341

----------

## OPINION

----------

In a single issue, Appellant Tommy George Dooley appeals his conviction for capital murder. Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2017). We affirm.

## Background

Appellant shot and killed his wife, LaVera, on February 12, 2015. He shot her six times while she was sitting in her SUV in their driveway and on the phone with 911. LaVera died while she was still on the phone with 911.

In an interview that evening with Investigator Robert Young, Appellant explained the tumultuous relationship he and LaVera shared. They had been married just over three years. During that time, they had worked together in an insurance business that LaVera owned, but had been struggling financially and often argued over money. The couple had discussed divorce as a possibility, and according to Appellant, he had been in the process of moving out of their home at the time of the shooting.

Appellant described LaVera, who was his fourth wife, as verbally and emotionally abusive toward him, claiming that LaVera would "get in [his] f***ing face" all the time when they argued, which was often, "beat down" on him, and according to Appellant, "[s]he just wouldn't f***ing leave [him] alone." Appellant told Young that he could not take it anymore.

LaVera had called 911 on one prior occasion, and when they began to argue again earlier in the evening of LaVera's death, Appellant said that LaVera went outside and threatened to call 911 again. Appellant told Young, "I asked her to get out of the g**d*** car, she wouldn't get out of the g**d*** car, I went into the house, I got the gun, I went back and I shot her. I guess I shot her six times because the gun was empty."

2

Appellant made multiple statements along these lines. At one point he said he told LaVera, "Open the window, let's talk," but LaVera replied, "I'm talking to 911," and then he shot her. At another point, he explained that he said, "Come here, let's talk," and she said, "I've got 911, I'm calling the police on you again," and Appellant thought, "Well, this is it, I'm f***ed." Yet another time he explained, "[S]he [went] and got in her g**d*** Mercedes and [said] 'I'm calling 911.' When you push somebody so much, then—well" and, "she just decided that she was going to go out and call the g**d*** police on me again." Appellant said that after he shot her initially, LaVera screamed to the 911 operator, "He shot me! He shot me!" so he shot her again. At another point, he told Investigator Young that he shot her "because she [was] f***ing mean."

Appellant also explained to Young that he was concerned she would report him for domestic abuse. Although he strenuously denied ever hitting or otherwise physically abusing LaVera, he was worried that domestic abuse charges could place his license to sell insurance at risk.

Appellant was charged with capital murder for killing LaVera in retaliation for or to obstruct her from calling 911 and reporting him to the police. *See id.* (providing elements of capital murder), § 36.06 (West 2016) (providing that a person commits an offense if he harms another by an unlawful act in retaliation for or to prevent their reporting of a crime).

At trial, Appellant only contested whether he shot LaVera in retaliation or obstruction of her call to 911. To support his defensive theory, Appellant offered

3

the testimony of Dr. Brian Falls, a forensic psychiatrist who met with Appellant once about a year after the murder. The State challenged the admissibility of Dr. Falls's testimony, and at a pretrial hearing, Dr. Falls explained his opinion.

Dr. Falls testified that, after meeting with Appellant for approximately five hours, he diagnosed Appellant with severe alcohol use disorder, general personality disorder, and a depressive disorder. Dr. Falls also testified that based on his review of a dozen or perhaps "a few dozen" peer-reviewed journals and literature from the Food and Drug Administration, Appellant's use of the drug Chantix, a smoking-cessation aid, was "one of several contributing factors" that caused Appellant to kill his wife. According to Dr. Falls, medical literature reported that Chantix had the ability to make some people act "aggressive[ly]," "impulsively, irrationally, and . . . very quickly, oftentimes."

Dr. Falls opined that Appellant's use of Chantix,[1] his heavy consumption of alcohol (contrary to the warning to avoid alcohol use on Chantix's packaging), his personality traits (including narcissism), and his psychopathic traits (including impulsivity) combined to cause him to abruptly kill his wife. In Dr. Falls's view, the spontaneous nature of the murder and because, a year after the fact, Appellant could not explain to Dr. Falls why he murdered LaVera, Appellant's actions were illogical and irrational. And, because of the illogical and irrational

---

[1]Falls admitted that Appellant had stopped taking Chantix four or five days before the murder, but testified that the FDA has acknowledged that people can have issues with aggression or violence even after they have stopped taking Chantix.

4

nature of the murder, Dr. Falls opined that Appellant did not murder LaVera in retaliation for her calling 911.

At the conclusion of the hearing, the trial court found that while Dr. Falls was qualified to testify as an expert, his expert opinion was inadmissible because it was not relevant to the jury's determination of guilt.

The jury found Appellant guilty of capital murder. Because the State elected not to seek the death penalty, Appellant was automatically sentenced to life in prison without parole. *See id.* § 12.31(a)(2) (West Supp. 2017).

**Discussion**

On appeal, Appellant argues that the trial court erred by excluding Dr. Falls's testimony regarding the effects of Chantix because, in his estimation, it goes directly to Appellant's mental state and whether he killed LaVera in retaliation for or to prevent her from calling 911.

## I. Standard of review and applicable law

We review the trial court's decision to exclude expert testimony for an abuse of discretion and will not disturb the decision so long as it is "within the zone of reasonable disagreement." *Kelly v. State*, 824 S.W.2d 568, 574 (Tex. 1992).

Rule 702 allows for the admission of testimony by an expert witness so long as (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will

5

actually assist the factfinder in deciding the case. Tex. R. Evid. 702; *Alvarado v. State*, 912 S.W.2d 199, 215–16 (Tex. Crim. App. 1995). As the sponsoring party, Appellant was required to demonstrate, by clear and convincing evidence, that Dr. Falls's testimony was (1) based on a reliable foundation and (2) relevant to the issues in this case. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (citing *Hartman v. State*, 946 S.W.2d 60, 62 n.4 (Tex. Crim. App. 1997); *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)); *see also Kelly*, 824 S.W.2d at 573 (establishing the burden of proof as clear and convincing evidence rather than simply preponderance of the evidence before scientific evidence may be admitted under rule 702).

To be relevant, an expert's opinion must not only assist the trier of fact in understanding the evidence or determining a fact in issue, but also be sufficiently tied to the facts of the case. *See* Tex. R. Evid. 702; *Jordan*, 928 S.W.2d at 555. In other words, as the expert, Dr. Falls was required to "make an effort to tie pertinent facts of the case to the scientific principles which are the subject of his testimony." *Tillman*, 354 S.W.3d at 438 (quoting *Jordan*, 928 S.W.2d at 555).

With regard to expert testimony involving *mens rea*, the court of criminal appeals has generally disapproved of opinion testimony to another person's state of mind. In *Winegarner v. State*, the court acknowledged that while a witness may testify to his own intention or state of mind, a witness's testimony to another person's state of mind is "necessarily based on conjecture" because "one person cannot possibly know another's state of mind." 505 S.W.2d 303, 305 (Tex. Crim.

6

App. 1974), *overruled on other grounds by White v. State*, 576 S.W.2d 843, 845 (Tex. Crim. App. 1979); *see also Jackson v. State*, 548 S.W.2d 685, 692–93 (Tex. Crim. App. 1977) (relying upon *Winegarner* in holding it was not proper for psychiatrist to testify to defendant's state of mind at time of voluntary manslaughter). However, expert testimony to a defendant's intent or state of mind has been held admissible in some limited circumstances, including: (1) cases involving the defense of insanity, *see Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) ("Insanity is the only 'diminished responsibility' or 'diminished capacity' defense to criminal responsibility in Texas."); (2) cases involving the defense of self-defense in a domestic violence situation, Tex. Code Crim. Proc. Ann. art. 38.36(b) (West 2005); or (3) cases where such testimony may be relevant to rebut or disprove the defendant's culpable *mens rea*, *Ruffin*, 270 S.W.3d at 593; *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005). Appellant argues that Dr. Falls's testimony is admissible because it was relevant to rebut or disprove Appellant's *mens rea*.

In 2005, the court of criminal appeals differentiated between evidence that tended to negate the requisite *mens rea* for a crime and evidence that simply presented an excuse for the crime. *Jackson*, 160 S.W.3d at 572. In *Jackson*, the defendant claimed that he had killed his brother because he was paranoid that his brother was out to get him. *Id.* He sought to present a defense of diminished capacity and presented evidence of his mental illnesses through his own testimony and that of a psychiatrist expert witness. *Id.*

7

The court, in reiterating that Texas does not recognize a diminished-capacity defense, held that evidence of the defendant's mental illness was inadmissible because it did not tend to negate the requisite *mens rea*. *Id.* The court explained that any evidence of defendant's mental illness did not serve to negate the applicable *mens rea*, but instead presented an excuse for the crime— "that Appellant killed his brother because he was so paranoid that he thought his brother was out to get him." *Id.* The expert testimony, the court explained, actually made the defendant's *mens rea*—the intent to seriously injure or kill his brother—more clear, not less so. Under the facts of that case, the expert testimony regarding the defendant's mental illness simply provided a motive for his intentional act. *Id.*

Three years later, however, in a case involving a mental illness in a different context, the court of criminal appeals rejected a blanket ban against the admission of expert testimony offered to rebut a defendant's *mens rea*, holding that expert testimony could be relevant and aid the jury in determining whether the defendant possessed the requisite *mens rea* under the facts of that case. *Ruffin*, 270 S.W.3d at 596. In *Ruffin*, the defendant was charged with aggravated assault of a police officer. *Id.* at 597–98. At trial, Ruffin offered testimony by his psychologist to the existence and severity of his mental disease and delusions, which had caused him to believe he was shooting at trespassers or Muslims, not police officers. *Id.* at 588. The court of criminal appeals compared Ruffin's delusions to blindness and used the example of a blind defendant who shot a

8

person upon hearing them approach his front porch. *Id.* at 593. If that person turned out to be a uniformed police officer, the court reasoned, the blind defendant could not be convicted of aggravated assault of a police officer because his blindness prevented him from seeing the uniform and knowing that the person was a police officer. *Id.* at 593–94. In that situation, evidence of defendant's blindness—either from a layperson or an expert witness—would certainly be relevant to rebut the argument that the man intended to shoot at a police officer. *Id.* at 594.

Using this analogy, the court reasoned that in other circumstances, expert testimony could be relevant to explain how a physical condition could distort a person's perceptions thereby negating *mens rea*:

> If, instead of blindness, the defendant suffers from mental delusions such that he sees a "trespasser" or a "Muslim" when everyone else around him sees a police officer, he cannot be convicted of intentionally shooting at a police officer, although he may be convicted of intentionally shooting at a trespasser or Muslim. Guilt of the greater offense requires that the State prove, beyond a reasonable doubt, that the defendant intended to shoot a police officer, not a trespasser or Muslim. That is the required *mens rea* and that is the State's constitutional burden of proof.

*Id.* at 594 (footnotes omitted). Thus, the court held, expert testimony to Ruffin's mental diseases and delusions was relevant to explain how his delusions distorted his "auditory and visual perceptions" and could aid the jury in determining whether the defendant intended to shoot at police officers. *Id.* at 597.

9

## II. Application

First, unlike the defendant in *Ruffin*, here there was no evidence that Appellant's use of Chantix actually negated his *mens rea*. Rather, Dr. Falls broadly opined that several factors—including Appellant's use of Chantix—combined to, essentially, create a "perfect storm" that made Appellant more impulsive and irrational.

But the question here is whether Dr. Falls's testimony was offered to provide an excuse for the crime, as in *Jackson*, or whether it was probative as to *mens rea*, as in *Ruffin*. The *mens rea* of capital murder as it was charged in this case was twofold: (1) Appellant's intent to kill LaVera, and (2) Appellant's intent to obstruct or retaliate against LaVera's calling of 911. *See* Tex. Pen. Code Ann. §§ 19.03(a)(2), 36.06.

Appellant argues that Dr. Falls's testimony was relevant and admissible to negate the *mens rea* of retaliation or obstruction, but we disagree. As it was presented in this case, the evidence of the influence of Chantix on Appellant is more closely akin to the influence of paranoia in *Jackson*—it merely provides a possible excuse for his irrational and impulsive behavior.

Dr. Falls essentially testified that Appellant killed LaVera because Chantix caused him to act impulsively and irrationally.[2] Notably, Dr. Falls did not testify

---

[2]Given the potentially harsh penal consequences of violent crime, much violent criminal behavior could be characterized as irrational and impulsive, regardless of whether drugs—prescription or otherwise—are involved.

10

that Chantix prevented him from being motivated, at least in part, by the fact that she was on the phone with 911, reporting him for domestic abuse. Here, Dr. Falls merely provided an excuse as to why, in his expert opinion, Appellant did not reflect and consider the consequences of his act prior to pulling the trigger multiple times. Thus, Dr. Falls's testimony provided an excuse for Appellant's overreaction to LaVera's contacting 911, but it does not negate Appellant's *mens rea*.[3]

We do not go so far as to hold that expert testimony to the side effects of Chantix or other medications is wholesale inadmissible. Appropriately presented, such testimony may be helpful to a jury if, for example, it caused delusions or hallucinations similar to those caused by mental illness in *Ruffin*. *Ruffin*, 270 S.W.3d at 597; *see also Jackson*, 160 S.W.3d at 574 ("[R]elevant evidence may be presented which the jury may consider to negate the *mens rea* element."). But the opinion evidence offered in this case by Dr. Falls was irrelevant.

Because the trial court did not abuse its discretion in excluding Dr. Falls's testimony, we overrule Appellant's only issue.

---

[3]To the extent that Dr. Falls intended to opine that Appellant could not have intended to kill LaVera in retaliation for or obstruction of her call to 911 because Appellant's actions were impulsive and irrational, this is the very type of impermissible speculation that *Winegarner* held to be impermissible conjecture as to another's state of mind. 505 S.W.2d at 305.

**Conclusion**

Having overruled Appellant's sole issue on appeal, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL:  SUDDERTH, C.J.; KERR and PITTMAN, JJ.

PUBLISH

DELIVERED:  March 1, 2018